Decided 2 January, rehearing denied 27 February, 1906.

## CARROLL *v.* GRANDE RONDE ELECTRIC CO.

### 84 Pac. 389.

ELECTRICITY — CARE REQUIRED IN TRANSMITTING.

1. Those engaged in making or transmitting electricity in large quantities or at high voltage are bound to exercise care commensurate wi h the danger in placing and protecting the instrumentalities used for those purposes.

EFFECT OF SHOWING CONTRIBUTORY NEGLIGENCE BY PLAINTIFF.

2. Where it appears from plaintiff's testimony that the one who sustained injuries was also guilty of negligence, without which the injury complained of would not have happened, such proof will defeat a recovery as a matter of law.

CONTRIBUTORY NEGLIGENCE — FAILURE TO RECALL KNOWN DANGER.

3. The rule enforcible between master and servant, that when the latter is called upon to quickly perform a service, he is not negligent in failing to recall a known danger, does not apply between persons not having reciprocal duties and obligations.

ELECTRICITY — EVIDENCE OF CONTRIBUTORY NEGLIGENCE.

4. Where a person of ordinary intelligence and of mature years, knowing that an electric power wire had broken and had been fastened to a fence, went up to see if it was alive, after having been warned to stay away, and putting one hand on the fence, pointed the other at the wire, in consequence of which the current jumped, he was guilty of contributory negligence, preventing a recovery for the injury received.

NEGLIGENCE — KNOWLEDGE OF DANGER — ASSUMED RISK.

5. In cases not between master and servant there is no distinction between knowledge of the existence of a danger and the assumption of the risk incident thereto.

CARE REQUIRED TO AVOID DANGER.

6. The law imposes on one sui juris the duty of using ordinary care to avoid known dangers, and therefore it is contributory negligence for such a person to voluntarily assume a position the danger of which he appreciates.

From Union: ROBERT EAKIN, Judge.

Action by Eliza Carroll, as administratrix of the estate of Leonard Carroll, deceased, against the Grande Ronde Electric Company. From a judgment in favor of defendant, plaintiff appeals.     AFFIRMED.

For appellant there was an oral argument by *Mr. Leroy Lomax* and *Mr. Gustave Anderson*, with a brief to this effect.

I. Electricity being a peculiarly dangerous element, the law raises a presumption of negligence on the part of the person operating the wires conveying it, whenever they are down and injury results: *Boyd* v. *Portland Elec. Co.*, 40

Or. 126 (7 Am. Electl. Cas. 661, 57 L. R. A. 619, 66 Pac. 576); *Haynes* v. *Raleigh Gas Co.*, 114 N. C. 203 (5 Am. Electl. Cas. 264, 26 L. R. A. 810, 41 Am. St. Rep. 786, 19 S. E. 344); *Fitzgerald* v. *Edison Elec. Illum. Co.*, 200 Pa. 540 (86 Am. St. Rep. 732, 50 Atl. 161).

II. A person or company using wires to carry electricity is bound to know the danger, while the public is not; and such person or company is bound to continuously use the highest degree of care to prevent injury: *Boyd* v. *Portland Elec. Co.*, 40 Or. 126 (7 Am. Electl. Cas. 661, 26 L. R. A. 810, 66 Pac. 576); *Giraudi* v. *Electric Improv. Co.*, 107 Cal. 120 (5 Am. Electl. Cas. 318, 48 Am. St. Rep. 114, 28 L. R. A. 596, 40 Pac. 108); *South Omaha W. Co.* v. *Vocaseck*, 62 Neb. 586 (87 N. W. 537); *Fitzgerald* v. *Edison Elec. Illum. Co.*, 200 Pa. 540 (86 Am. St. Rep. 732, 50 Atl. 161); *Texarkana Gas & E. L. Co.* v. *Orr*, 59 Ark. 215 (5 Am. Electl. Cas. 272, 43 Am. St. Rep. 30, 27 S. W. 66).

III. Failure to promptly detect and repair the break in the wires is not excused by showing that a heavy wind storm caused such break, and where the evidence discloses that the wires were allowed to remain broken after the storm had subsided, the fact of knowledge of the storm aggravates the wrong, and keeping the current on after such knowledge is, as a question of law, gross and wanton negligence: *Texarkana Gas & E. L. Co.* v. *Orr*, 59 Ark. 215 (43 Am. St. Rep. 30, 5 Am. Electl. Cas. 272, 27 S. W. 66); *Central Union Teleph. Co.* v. *Sokola*, 34 Ind. App. 429 (73 N. E. 143); *Cleary* v. *St. Louis Transit Co.* (Mo. App.), 83 S. W. 1029.

IV. An ordinary person is not presumed to know the nature and danger of electricity in its subtle and multiform ways, and one injured by this agency through the fault of the person whom the law charges with such knowledge, cannot, as a question of law, be charged with contributory negligence, where it is not shown that he knew

or had notice of the special peril to which he was exposed: *Clements* v. *Louisiana Elec. Lt. Co.*, 44 La. Ann. 692 (4 Am. Electl. Cas. 381, 11 So. 51, 16 L. R. A. 43, 32 Am. St. Rep. 348); *Giraudi* v. *Electric Imp. Co.*, 107 Cal. 120 (5 Am. Electl. Cas. 318, 48 Am. St. Rep. 114, 28 L. R. A. 596, 40 Pac. 108); *Perham* v. *Portland Elec. Co.*, 33 Or. 451 (7 Am. Electl. Cas. 487, 40 L. R. A. 799, 72 Am. St. Rep. 730, 53 Pac. 14); *Thomas* v. *Maysville Gas Co.*, 108 Ky. 224 (7 Am. Electl. Cas. 588, 53 L. R. A. 147, 56 S. W. 153).

V. The law recognizes a distinction between knowledge of dangerous conditions and realization of the risk. A person may know the facts and yet not understand or realize the risk or special peril of the position, and where such is the case the person injured cannot, as a legal proposition, be charged with contributory negligence: *Texarkana Gas & E. L. Co.* v. *Orr*, 59 Ark. 215 (43 Am. St. Rep. 30, 5 Am. Electl. Cas. 272, 27 S. W. 66); *South Omaha W. Co.* v. *Vocaseck*, 62 Neb. 586 (87 N. W. 537); *Washington & G. R. Co.* v. *McDade*, 135 U. S. 554 (10 Sup. Ct. 1044); *Inland & S. C. Co.* v. *Tolson*, 139 U. S. 551 (11 Sup. Ct. 653); *Grand Trunk R. Co.* v. *Ives*, 144 U. S. 408 (12 Sup. Ct. 679); *Leavenworth Coal Co.* v. *Ratchford*, 5 Kan. App. 150 (48 Pac. 927); *McQuillan* v. *Seattle*, 10 Wash. 464 (45 Am. St. Rep. 799, 38 Pac. 1119); *Predmore* v. *Consumer's L. & P. Co.*, 99 App. Div. 551 (91 N. Y. Supp. 118); *Simonds* v. *Baraboo*, 93 Wis. 40 (57 Am. St. Rep. 897, 67 N. W. 40); *Roth* v. *Northern Pac. Lum. Co.*, 18 Or. 205, 213 (22 Pac. 842); *Gardner* v. *Wasco County*, 37 Or. 392, 398 (61 Pac. 834, 9 Am. Neg. Rep. 35); *Stager* v. *Troy Laundry Co.*, 38 Or. 480, 486 (53 L. R. A. 459, 63 Pac. 645).

For respondent there was an oral argument by *Mr. Thomas Harrison Crawford*, with a brief over the name of *Crawford & Crawford*, to this effect.

1. An electric light and power company that has erected its poles and wires along and over a public highway with

the consent of the proper authorities is only bound to exercise care and diligence proportional to the danger, and is not an insurer against accident: *Boyd* v. *Portland Elec. Co.*, 37 Or. 567 (7 Am. Electl. Cas. 605, 52 L. R. A. 509, 8 Am. Neg. Rep. 378, 62 Pac. 378); *Denver Consol. Elec. Co.* v. *Simpson*, 21 Colo. 371 (31 L. R. A. 566, 5 Am. Electl. Cas. 278, 25 Am. St. Rep. 242, 41 Pac. 499); Crosswell, Electricity, § 236; Keasby, Elec. Wires (2 ed.), § 236.

2. Where one is in the presence of a known danger he is bound to use ordinary care not to come in contact with such danger and thereby expose himself to injury. If he fails to use care, and voluntarily exposes himself to a known danger and is injured, he is guilty of such contributory negligence as will preclude a recovery of damages: *Clements* v. *Louisiana Elec. Lt. Co.*, 44 La. Ann. 692 (16 L. R. A. 43, 32 Am. St. Rep. 348, 4 Am. Electl. Cas. 381, 11 South. 51); *Cook* v. *Wilmington City Elec. Co.*, 9 Houst. 306 (32 Atl. 643); *Anderson* v. *Jersey City Elec. Co.*, 64 N. J. Law, 664 (46 Atl. 593, 48 L. R. A. 616, 81 Am. St. Rep. 504); *Frauenthal* v. *Laclede Gaslight Co.*, 127 Mo. 79 (29 S. W. 988); *Wood* v. *Diamond Elec. Co.*, 186 Pa. 529 (39 Atl. 1111); *Columbus R. Co.* v. *Dorsey*, 119 Ga. 363 (46 S. W. 635); *Tri-City Ry. Co.* v. *Killeen*, 92 Ill. App. 57; *Danville St. Car Co.* v. *Watkins*, 97 Va. 713 (34 S. E. 884); *Mayor of Cumberland* v. *Lottig*, 95 Md. 42 (51 Atl. 841).

3. An electric company is ordinarily under no legal obligation to a mere trespasser or licensee other than not to willfully or wantonly harm him: *McCaughna* v. *Owosso & C. Elec. Co.*, 129 Mich. 407 (95 Am. St. Rep. 441, 89 N. W. 73); *Keefe* v. *Narragansett Elec. Co.*, 21 R. I. 575 (43 Atl. 542); *Sullivan* v. *Boston R. Co.*, 156 Mass. 378 (31 N. E. 128); *Augusta Ry. Co.* v. *Andrews*, 89 Ga. 563 (4 Am. Electl. Cas. 378, 16 S. E. 203); *Cumberland Teleph. Co.* v. *Martin*, 116 Ky. 554 (76 S. W. 394, 77 S. W. 718); *Hector* v. *Boston Elec.*

*Lt. Co.,* 161 Mass. 558 (5 Am. Electl. Cas. 300, 37 N. E. 773, 75 Am. St. Rep. 300, 25 L. R. A. 554).

MR. JUSTICE MOORE delivered the opinion of the court.

This is an action by Eliza Carroll, as administratrix of the estate of her son Leonard Carroll, deceased, against the Grande Ronde Electric Co., a private corporation, to recover damages resulting from his death, which is alleged to have been caused by its negligence in constructing lines of electric wires and in failing to repair such wires when broken. The answer denies the material averments of the complaint, and, for a further defense, alleges that Carroll's death ensued from his own carelessness. The allegations of new matter in the answer were put in issue by the reply, and at the trial, the plaintiff having introduced her testimony and rested, the court, on motion of defendant's counsel, gave a judgment of nonsuit, and she appeals.

The bill of exceptions shows that the defendant operates at Cove a power plant, where it generates electricity, which is transmitted on overhead wires 17 miles westerly to La Grande at a pressure of 23,500 volts, and by a branch from the main line, starting at a point about five miles from Cove, is carried a current at the same voltage southerly eight miles to Hot Lake and supplied from substations at both termini to customers who use it for light, heat or power. The injury complained of occurred on the branch line where it runs south on the west side of a public highway extending through the farm of Frank Hempe. This line consists of three uninsulated wires, one of which is suspended from the tops of poles about 30 feet high, set about 125 feet apart, and the other wires are attached, each to the end of cross-arms fastened to such poles near the top. A very severe wind, arising Sunday, August 27, 1905, at about four o'clock in the afternoon, blew a green limb from a tree growing on Hempe's land across the wires,

causing two of them to burn off and fall, so that the ends
thereof, in the direction from whence the current came,
lodged, one against the pole by which it was suspended,
and the other on the ground, where it emitted sparks, set-
ting fire to dry leaves ; and, some cattle being near, John
W. Minnick, who with his employees was threshing grain
for Hempe, apprehending danger, by using a dry stick
looped the wire over the end of a picket in a fence enclos-
ing a lawn about Hempe's house, pushing the noose down
against the upper rail of the palings.   The loop placed over
the picket not appearing to be securely fastened, Minnick
bent the wire more, still using the dry stick for that pur-
pose, and, wondering whether it still possessed electrical
energy, he put out his finger, and when it came within
about eight inches of the wire a blaze suddenly appeared,
burning his hand and causing him to fall insensible, from
the effects of which shock he did not fully recover for sev-
eral days.   Minnick's son, seeing his father fall, immedi-
ately ran to his assistance, when, coming in contact with
the wire that was lodged against the pole, he also received
a shock.   Soon after the wires fell, a dog chasing cattle
away from the place of danger also came in contact with
the electric current.   When the end of the wire was fas-
tened to the fence, Hempe's son George was present and
knew that the several shocks were so received.

Leonard Carroll, who was 24 years old, was working in
August, 1905, for Hempe as a farm laborer.   He was not
at the home of his employer, however, when the wires fell ;
but, returning that evening, he ate supper with the family
and also breakfast the next morning, at which meals the
dangerous condition of the wires was freely commented
upon, the several shocks received therefrom were adverted
to, and at breakfast Hempe, in his hearing, warned the
persons participating in the repast to keep away from the
broken wires, as by approaching them they might be

killed. Carroll assisted that forenoon in hauling oats from Hempe's field to Minnick's machine to be threshed. About 12 o'clock that day, as George Hempe, who was nearly Carroll's age, was returning to the house for the midday meal, he concluded to ascertain whether or not the broken wires, which had not been repaired, were still charged with electricity, and going inside the inclosure to the place where the end of the wire towards the power house was fastened to the picket fence, he expected to make a test with a green weed suspended from a dry stick. Carroll went with him, and, standing at his left about two feet north of the point where the end of the wire was fastened, he seized the top of one of the fence pickets with his left hand, and, in his ignorance of electricity, pointed his index finger toward the wire, which was about eight inches distant, when there was a sudden flash, burning his hand and killing him.

George Hempe, as plaintiff's witness, testified that he was present when the wires were fastened to the fence, but his back was turned when Minnick received the shock, though hearing him holloa, and the witness turned as he fell, and that on the morning of August 28, 1905, he discussed with Carroll the danger of the broken wires. On cross-examination George stated that he told Carroll about Minnick's getting shocked and knocked down, whereupon defendant's counsel, referring thereto, inquired: "Did you tell him he put his hand up toward the wire and there was a blaze came out to him, and that is the way he got it?" To which the witness replied: "Yes, I think I told him something to that effect." Referring to the manner in which Carroll was injured, the witness was further asked on cross-examination:

"Isn't it a fact that he went up and took hold of the picket there and stuck his finger out in that way?"

And he answered:

"Well, when he took hold of the picket, he reached out and took hold of it like that, and these three fingers closed while the other extended.

Q. Extended out towards the wire?

A. Yes. * *

Q. Well, now, did his hand come in contact with the wire?

A. I don't think it did. The last time I saw it before the blaze started, it was probably about eight inches from the wire, and after the blaze started I could not say. * *

Q. As a matter of fact, from where he took hold of that picket here, his finger — his forefinger of his left hand — was pointed directly towards the wire, wasn't it?

A. Yes."

Frank Hempe, as plaintiff's witness, testified that he was not at home when the wires burned off, but that he returned that night about 8 o'clock. In referring to the broken wires at that hour, plaintiff's counsel inquired:

"What did you see about that?"

And the witness answered:

"Well, they were sparking and I cautioned the people that they were dangerous and to keep away from those wires. * *

Q. You saw the wires?

A. I didn't see any wire. I saw the fire and sparks. I didn't see any wire. I thought it was dangerous."

On cross-examination, defendant's counsel, referring to Monday, August 28, 1905, inquired:

"I will ask you to state whether or not, at the breakfast table that morning, when Mr. Leonard Carroll was present and your son George, that you said to all of those parties to stay away from that wire; that it was extremely dangerous, and they might get killed?" To which he replied: "Yes."

Mrs. Frank Hempe, as plaintiff's witness, testified, on cross-examination, that Leonard Carroll took supper with her family Sunday evening, August 27, 1905, when the

breaking of the wires was discussed; that at the breakfast the next morning, when Carroll was present, the broken wires were again the subject of debate, and attention was called to Minnick's being knocked down; that she heard her husband say, at that meal, in the presence of Carroll, and of her son George, to stay away from the wires, for if they went about them they were liable to be killed. This witness, referring to what was further observed on that occasion, testified as follows:

"I said the best thing to do was to keep away from that wire.

Q. Mr. Leonard Carroll was there at that time?

A. Yes.

Q. Was that at the breakfast table or the supper table?

A. Breakfast table.

Q. Well, these matters were talked—were made a matter of general conversation—were they not, between the parties at the supper table and breakfast table?

A. Yes.

Q. And to what extent Mr. Minnick had got hurt?

A. Yes.

Q. And that it was fortunate that he didn't get killed and matters of that kind?

A. Yes.

Q. And it was discussed how dangerous it would be if a person happened to get near the wire, if it happened to be charged with electricity? That was all talked, wasn't it, Mrs. Hempe?

A. Yes."

Though no testimony was introduced on the part of the defendant, the answer states facts which were evidently relied upon to excuse the delay in failing to discover the break in the wires, so that it might sooner have been repaired. That pleading details the manner in which the defendant's station, substations, and transmission lines are constructed, maintained and operated, and avers that the power plant, at the time of the wind storm adverted to,

was supplied with the latest and best improved electrical devices for promptly detecting any grounding of the wires; that at the time the wires were burned off at Hempe's farm a tree fell upon the main line at a point about four miles east of La Grande, breaking the wires, the grounding of which simultaneously at each place was immediately indicated at the station at Cove, whereupon the plant was instantly shut down ; that the break in the main line was soon thereafter located and about midnight repaired, when the electric power was applied at Cove and "tested out clear" on the transmission lines, owing to the fact that at Hempe's farm the end of the broken wire had been placed on the dry picket fence, thereby producing such insulation as to prevent the grounding of the current at that place, and thus rendering it impossible to detect a break in the wires at the power station ; that at Hot Lake the electric substation is automatic in its operation, requiring only occasional attention to insure its efficiency, and on August 28, 1905, an employee of the defendant going to that place discovered that two of the wires leading thereto were "dead," indicating a break therein on the branch line, and immediately telephoned the person managing the power plant, who instantly stopped the machinery in order that the necessary repairs might be made. In a few minutes thereafter the defendant was notified by telephone that a man had been killed at Hempe's farm, by coming dangerously near or in contact with a broken wire, such person proving to be plaintiff's intestate.

1. The care which the law exacts from any person, firm or corporation, engaged in operating an instrumentality is always in proportion to the degree of danger reasonably to be apprehended from the use of the means employed. Electricity is a natural force, the power of which is fully comprehended only by experts, who may be aware of the

47 OR.—— 28

measure applied, and, when such instantaneous energy is transmitted, either in large quantities or at high voltage, the wires conducting it should be placed and kept beyond the reach of common people who have no conception of the extreme danger to which proximity to or contact therewith will necessarily expose them. This danger is augmented by the falling of electric wires in places of common resort, and the peril is enhanced by the length of time the wires remain down in such localities. Without attempting to discuss the defendant's alleged excuse for its failure sooner to discover the break in the wires on the branch line, we shall take for granted that permitting a wire charged with 23,500 volts of electricity to remain for about 20 hours fastened to a picket fence, beside a public highway, in such a condition that any living creature coming in contact with such wire must necessarily suffer death, affords prima facie evidence of negligence: *Boyd* v. *Portland Elec. Co.*, 40 Or. 126 (66 Pac. 576, 7 Am. Electl. Cas. 661, 57 L. R. A. 619); *Haynes* v. *Raleigh Gas Co.*, 114 N. C. 203 (5 Am. Electl. Cas. 264, 19 S. E. 344, 26 L. R. A. 810, 41 Am. St. Rep. 786).

2. Having assumed, without deciding, that the defendant's want of ordinary care in failing sooner to repair its branch line was the primary cause of the injury complained of, it remains to be seen whether or not the testimony introduced by the plaintiff shows that Leonard Carroll was also guilty of negligence contributing to his death. It has been repeatedly held in this State, in actions to recover damages resulting from a personal injury, that, if it appears from the testimony offered by the plaintiff that the person sustaining the hurt was also guilty of negligence, without which the injury complained of would not have happened, such proof, as a matter of law, will defeat a recovery: *Tucker* v. *Northern Term. Co.*, 41 Or. 82 (68 Pac. 426, 11 Am. Neg. Rep. 629, 27 Am. & Eng. R. R.

Cas. N. S. 166); *Massey* v. *Seller*, 45 Or. 267 (77 Pac. 397 11 Am. Neg. Rep. 553); *Abbot* v. *Oregon Railroad Co.*, 46 Or. 549 (80 Pac. 1012, 1 L. R. A., N. S. 851, 39 Am. & Eng. R. Cas. N. S. 52).

In *Anderson* v. *Jersey City Elec. Light Co.*, 64 N. J. Law, 665 (46 Atl. 593, 48 L. R. A. 616, 81 Am. St. Rep. 504), the plaintiff, desiring to convince a companion that an electric wire was so insulated that no injury could result to a person by coming in contact with it, deliberately touched the wire to make the demonstration, when he received a severe shock, seriously injuring him. In an action to recover the damages sustained, a judgment of nonsuit was rendered, in affirming which, Mr. Justice Gummere, referring to the plaintiff, says: "He knew that the wire might be dangerous if the insulation was not perfect, and, having voluntarily assumed the risk of injury in order to vindicate the soundness of his judgment, he has no one but himself to blame for the consequences which followed." So, too, in *Wood* v. *Diamond Elec. Co.*, 185 Pa. 529 (39 Atl. 1111), a person having been killed by coming in contact with a wire screen charged with electricity, which screen was used to protect glass in a photographic gallery from breaking, the plaintiff's intestate, to demonstrate to the multitude assembled in consequence of the death, that the shield was not laden with electricity, voluntarily touched it, causing his death also. An action having been instituted to recover damages sustained by reason of the latter's death, a judgment of nonsuit was given, in refusing to remove which the court on appeal say: "We find nothing in the evidence tending to prove that the proximate cause of the death of plaintiff's husband was the defendant company's negligence. On the contrary, it clearly appears that his death was the result of his own voluntary, deliberate act in touching the screen heavily charged with electricity, in the face of ample notice

that it was so charged. His evident purpose, in thus touching the screen, was to demonstrate to those who asserted it was thus charged that they were mistaken."

It will be remembered that Frank Hempe testified that, when he returned Sunday, August 27, 1905, at about 8 o'clock in the evening, he discovered that the broken wires were emitting sparks. His declaration in this respect contradicts the averment of the answer that the electric current was not turned on until about 12 o'clock that night. It will also be kept in mind that this witness, on Monday morning, in the presence of Carroll, warned all persons at the breakfast table to keep away from the broken wires, saying they were extremely dangerous, and that by coming in contact with them death might ensue. Mrs. Hempe, also, in Carroll's hearing, reiterated the warning. It must be assumed that Carroll knew that, if he approached the broken wires, so as to come in contact with them, danger was imminent. Though Carroll was not present when the wires burned off Sunday evening, he must have known the manner in which Minnick received the shock that prostrated him on that occasion, for George Hempe testified that he told Carroll that Minnick put his hand out towards the wire. Notwithstanding Carroll's knowledge of the dangerous condition of the broken wires, and the warnings given by Mr. and Mrs. Hempe to keep away from the place where he was injured, he evidently concluded to make the same experiment that Minnick tried, and, in doing so, he was killed.

3. It is argued by plaintiff's counsel that the law recognizes a distinction between knowledge of the condition of an instrumentality and recognition of the risk incident thereto; and, this being so, though Carroll may have known that to approach the broken wires was hazardous, the court, in the absence of any testimony tending to show that he was aware of the peril to which he was exposed,

erred in concluding, as a matter of law, that his death was caused by his contributory negligence. The legal principle involved has been established as a rule in this State: *Roth* v. *Northern Pac. Lum. Co.*, 18 Or. 205 (22 Pac. 842); *Johnston* v. *Oregon Short Line Ry. Co.*, 23 Or. 94 (31 Pac. 283); *Viohl* v. *North Pac. Lum. Co.*, 46 Or. 297 (80 Pac. 112). These cases were actions instituted by servants against their masters to recover damages for personal injuries received while engaged in the performance of duties devolving upon the plaintiffs, respectively. The rule thus recognized is based upon the theory that, though a servant may have knowledge of the dangers incident to his employment, if the service required of him demands a speedy performance, such haste will excuse his temporary lapse of memory in failing to take cognizance of the peril to which he is exposed : *Giraudi* v. *Electric Imp. Co.*, 107 Cal. 120 (40 Pac. 108, 28 L. R. A. 596, 5 Am. Electl. Cas. 318, 48 Am. St. Rep. 114). In the case at bar, the relation of master and servant did not exist between Carroll and the defendant company, nor, so far as we are able to discover from the bill of exceptions, was there any necessity compelling him to approach the broken wires, nor any circumstances that induced him for an instant to become oblivious to the peril that might be produced from contact with them. The rule invoked cannot therefore have any application to the facts involved.

It will be borne in mind that Carroll was 24 years old at the time he received the fatal shock, and his age precludes the application of the prevailing rule as to the liability of railroads for injuries sustained by children while playing on turntables, or for hurts sustained by persons of immature years from other instrumentalities which they, by the carelessness of others, are permitted to approach. Carroll probably did not know that the wires transmitted such a high voltage of electricity. He had

been employed at Hempe's farm about a month prior to his death, and, having frequent opportunity to observe the condition of the wires, he must have known that they were uninsulated, and were used for supplying electricity for lighting purposes. As he must have been aware of these facts, he ought also to have known that contact with a wire transmitting sufficient electricity for general illumination was extremely dangerous, and he should have accepted the advice of Mr. and Mrs. Hempe and remained away from the broken wires. Instead of obeying these warnings, he evidently, like Minnick, desired to see how near the wire he could place his finger without sustaining a shock, and, his hand coming in contact with the wire or within its danger zone, he was killed.

We think his act in this respect shows such contributory negligence as to prevent a recovery of the damages sustained, and hence the judgment is affirmed.

AFFIRMED.

---

Decided 27 February, 1906.

ON MOTION FOR REHEARING.

MR. JUSTICE MOORE delivered the opinion of the court.

In a petition for a rehearing, plaintiff's counsel, invoking the rule that on a motion for a judgment of nonsuit all reasonable presumptions and every legitimate inference that can arise from the evidence should be invoked in favor of the party bringing the action, so as to carry the case to the jury, insist that this court, in reviewing the testimony given at the trial, improperly considered parts thereof and omitted other material parts to the injury of their client. The principal objection is made to a statement contained in the opinion to the effect that Leonard Carroll pointed his finger at the wire when he was killed.

A reëxamination of the bill of exceptions shows that George Hempe, as plaintiff's witness, testified that Carroll went with him to the picket fence, knowing that the witness was going to test the wire to determine whether or not it was still alive. Hempe further testified that the wire was broken about 25 feet from the pole and extended from the picket to which it was fastened northerly up to the insulator by which it was suspended, and that the pole referred to stood in the public road about six or eight feet east of the picket fence. In answer to the question: "How was the wire with reference to being down even with the fence or above or below? What was the relative position of the wire along there?" the witness replied: "To my remembrance the wire was about that high from the picket. [About five or six inches.—Reporter.]" Plaintiff's counsel, referring to Carroll, inquired:

"You say he took hold of one of the pickets with his left hand?" Hempe answered: "Yes.

Q. About what distance was it back where he took hold of the picket from the end of the wire that was hanging on the picket?

A. Well, I think it was about two feet or thereabouts.

Q. Then how far was the wire that was suspended along in front of the pickets? How far in front of his hand was the body of the wire along there, if you know? How close was his hand to it?

A. Well, probably about eight inches from the wire.

Q. In other words, the wire just passed by his hand towards the end of it?

A. Yes.

Q. Where were you testing it with the stick?

A. At the end of the wire.

Q. And he was standing at the north side of you was he?

A. Yes."

The upper end of a picket, cut from the fence above the top stringer and supposed to be the one Carroll grasped, was identified by the witness, offered in evidence, and sent

up as an exhibit. This part of the picket is tapered wholly on one edge so that the apex is in line with the opposite side.

Defendant's counsel, referring to the manner in which Carroll was injured, inquired:

"Isn't it a fact that he went up and took hold of the picket there and stuck his finger out in that way? '

A. Well, when he took hold of the picket he reached out and took hold of it like that, and these three fingers closed while the other extended.

Q. Extended out towards the wire?

A. Yes.

Q. Now, when you saw that finger sticking out there, at that instant you saw the flash from the wire to his finger, didn't you?

A. Yes—not at that instant exactly, but a very short time until the electricity made the circuit. * *

Q. When he took hold of the picket, was he turned looking towards you, or which way was he looking?

A. He was looking almost straight ahead of him, I should think. * *

Q. Well, now, did his hand come in contact with the wire?

A. I don't think it did. The last time I saw it before the blaze started, it was probably about eight inches from the wire, and after the blaze started I could not say.

Q. You don't know whether his hand came in contact with the wire or not?

A. I don't know. It didn't before the current started, and after the current started I could not say, there was such a bright blaze.

Q. Now, George, isn't it a fact, that he walked up there, and, when you were testing that matter, stepped across the ditch and simply reached out his hand towards that wire, and received that shock? Isn't that a fact, George?

A. No, sir; he put his left hand on the fence.

Q. And stuck his finger out towards it this way? That is the way he did it, didn't he?

A. I can show you with the picket.

Q. Didn't he point his finger out towards the wire?

A. That finger never closed. The other three fingers closed on the picket, and the fourth finger extended.

Q. Now, don't you know, as a matter of fact, that he was pointing his finger at the wire?

A. No, I don't know it.

Q. Well, why do you say then that he didn't point his finger at the wire?

A. I didn't say exactly that he didn't point his finger at the wire.

Q. As a matter of fact, from where he took hold of that picket here, his finger — his forefinger of his left hand — was pointing out directly towards the wire, wasn't it?

A. Yes.

Q. You don't know whether his finger was in that position by reason of the fact that he didn't close his finger from the wire, or by reason of the fact that he was pointing his finger at the wire?

A. Well, he never said anything, so I don't know.

Q. You don't know whether he was in fact pointing at the wire to see how close he could get to it without receiving a deadly shock, or not, do you?

A. No, he didn't say."

The testimony shows that Carroll knew when he went with Hempe, that the latter was going to test the wire, to ascertain whether or not it was alive. The contemplated experiment recognizes the existence of a suspicion that the wire might possibly be charged with electricity, which misgiving is evidenced by Hempe's desire to avoid personal injury by securing a dry stick and a green weed with which to make the required test. It will be remembered that the wire, at the point where Carroll grasped the top of the picket, was about eight inches east of, and six inches above, his hand, and that he stood facing the east. The warnings he had received as to the dangerous condition of the wire and the suspicion he entertained in respect thereto put him on his guard so that he must have seen the wire when he was looking in that direction, and it would seem that, as he did not instantaneously receive

a shock, he must have advanced his finger outward and upward after seizing the picket. Whether Carroll's finger was extended in consequence of the peculiar shape of the top of the picket, or because of his curiosity and desire to ascertain the utmost limit at which electrical energy could be appreciated, is unimportant, for no different rule of law can be invoked as applicable to his action in either case.

When Minnick in fastening the wire to the fence received a shock, George Hempe's back was turned so that the latter could not say of his own knowledge whether the injury resulted from direct contact with the wire or by coming within the danger zone thereof, and, though Hempe told Carroll of such injury, the testimony does not show that Carroll had any greater knowledge of the cause of the hurt than Hempe possessed. It would seem reasonably to be implied, however, that Carroll was told that such injury was caused, not by contact with, but by approach to, the wire, for George Hempe testified that he informed him that Minnick put his hand out "towards" the wire.

5. If it be conceded that Carroll supposed that Minnick was injured by touching the wire, does the law in such case recognize a distinction between knowledge of the existence of a dangerous instrumentality and recognition of the risk incident thereto? An affirmative answer to this question would permit a stranger to touch any machinery which was running so rapidly as to impart no notice of its motion, in order to satisfy his curiosity, and, if in making the demonstration any injury was sustained, the owner of the instrumentality would be liable therefor if he was negligent in permitting such appliance to remain exposed.

6. The law imposes upon a person sui juris the obligation to use ordinary care for his own protection, the degree of which is commensurate with the danger to be avoided. As danger from uninsulated wires is propor-

tionated by the amount of electricity so transmitted, contact with such wires should be avoided when their existence is known.   So, too, suspicion, entertained by a person of suitable age and reasonable discretion, that a fallen wire is charged with electricity, should induce him to shun. if possible, the surmised peril, for the rule of law is that one who voluntarily assumes a position of danger, the hazards of which he understands and appreciates, cannot recover for an injury from a risk incident to the position: *Fitzgerald* v. *Connecticut River Paper Co.*, 155 Mass. 155 (29 N. E. 464, 31 Am. St. Rep. 537); *Robinson* v. *Manhattan Ry. Co.*, (Com. Pl.) 25 N. Y. Supp. 91.

Leonard Carroll entertained a suspicion as to the danger that might result from contact with the broken wire, but he evidently did not know that, if it was "alive," it was so heavily charged with electricity that death would ensue if he came within the hazard belt.   As he had been warned, however, of the danger by Mr. and Mrs. Hempe, informed by their son George that Minnick received a shock that prostrated him by putting his hand up "towards" the wire, and knew that a test was to be made to ascertain whether or not electricity was present, thereby imputing a suspicion of its existence, we think the testimony shows that he voluntarily assumed a position of danger, the hazards of which ought to have been known by a person of his age and discretion.

The petition is therefore denied.

AFFIRMED: REHEARING DENIED.