Argued November 20, affirmed December 17, 1958, petition
for rehearing denied January 14, 1959

## JAMERSON, Administratrix, *v.* WITT,
### Executrix, et al
### 332 P. 2d 1054

*E. B. Sahlstrom* and *Albert H. Ferris,* Eugene, argued the cause for appellant. On the brief were Thompson & Sahlstrom, Eugene.

*John E. Jaqua* argued the cause for respondent Maud Ardella Witt. On the brief were Thwing, Jaqua & O'Reilly, Eugene.

*Windsor Calkins* argued the cause for respondent Lane County Electric Co-operative, Incorporated. On the brief were Calkins & Calkins, Eugene.

Before PERRY, Chief Justice, and ROSSMAN, LUSK and McALLISTER, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff, administratrix of the estate of W. T. Jamerson, deceased, from a judgment which the circuit court entered after it had sustained motions made by each of the two defendants for orders of involuntary nonsuit. The action was instituted under ORS 30.010 through 30.100, our wrongful death statute. Jamerson, upon whose death this action is founded, lost his life by electrocution June 7, 1954. Defendant Maud A. Witt is the widow of Thomas R. Witt, and the executrix of that decedent's estate. The other defendant-respondent is Lane County Electric Co-operative, Incorporated, to which we will refer as the Co-operative. Witt met his death concurrently with Jamerson and also by electrocution. One of the two decedents, possibly both, was or were attempting to raise a television mast with an attached antenna when it came in contact with transmission wires overhead which the Co-operative had installed in 1940. Witt accepted engagements to install television aerials at the close of his day's regular employment, and, pursuant to a request of the Jamersons, was in their yard attempting to install an aerial for them when he and Jamerson were overtaken by death.

The motion for an order of involuntary nonsuit made by each of the defendants contended that (1) the record contained no proof of negligence on the part of either defendant, and (2) the evidence established contributory negligence by the plaintiff's decedent.

The plaintiff-appellant presents two assignments of error. One charges that error was committed when judgment of involuntary nonsuit was entered in favor of the Co-operative, and the other is predicated upon

a similar judgment which was entered in favor of defendant Witt.

No one saw death strike. The manner in which ultimate fortune struck down the two men is left largely to conjecture. It was stipulated, however, that electrocution was the cause of both deaths.

The Jamersons owned a home on the upper McKenzie highway and had lived there for 23 years. In 1940 they granted to the Co-operative an easement whereby that concern installed a power line across the rear of their property consisting of six wires strung from two poles, one of which stood on the north line of the property and the other on the south line. The wires spanned a distance of 434.2 feet and ran east and west. The upper three wires, if we understand the testimony correctly, carried 7,200 volts each. The other three wires were five feet lower on the poles and each carried 110 volts. Voltage as low as 25 volts can cause death. The wires were not insulated.

The Jamersons had owned a television set which gave them unsatisfactory reception. The decedent Jamerson called upon the aforementioned Thomas R. Witt, and on June 7, 1954, at 4:15 p. m., Witt came to the Jamerson home. He had never been there before. Mrs. Witt accompanied him.

After the Witts entered the Jamerson home, Mr. Witt, according to Mrs. Jamerson, "turned on the TV and seen the reception and said, 'Well, I can put up an antenna and find a better location to get better reception than that.'" Presently the two men left the house and entered the back yard. Witt came to the Jamersons in a truck in which he brought a television mast, an antenna, a field test meter and tools. He parked the truck on a gravel road which led from the highway to the Jamerson home. After the two men

had gone outdoors and their wives had engaged in conversation for some time, Mrs. Witt, so Mrs. Jamerson declared,

> "got up and said, 'Well, I wonder what in the world is the matter,' and she went out and looked out the bathroom window, and I got up and went out and looked in the kitchen window. Well, I saw Mr. Witts was there working by the pickup and he was working with the antenna.
>
> "Q What was he doing, do you know?
> "A I don't know. He was working around the bars on the antenna. I couldn't say just what he was doing.
>
> "Q Where was Mr. Jamerson in relation to where Mr. Witt was standing?
> "A My husband was standing, oh, right on this side of Mr. Witts (indicating).
>
> "Q How many feet away, approximately?
> "A About four feet away, I would say three or four feet.
>
> "Q What was he doing?
> "A Wasn't doing anything that I know of.
>
> "Q That's all you saw at that time, and you went back and sat down?
> "A I went back and sat at the piano stool and Mrs. Witts came back and sat in her chair, and then I played another piece."

The foregoing represents the last time that the two men were seen alive.

After the two women had had further conversation, the following, according to Mrs. Jamerson, occurred:

> "all at once she jumped out of her chair again. I wondered what in the world was wrong again. Then she went to the bathroom window again and that's when she said, 'My goodness! Something is wrong, they are both lying on the ground.' And

then I turned around and went out and looked out of the kitchen window. I could see that they were lying there so I ran out to them, * * *."

Jamerson's body lay with the head toward the south and the feet toward the north. The wires, it will be recalled, ran east and west. Witt's body lay with the head toward the north. The feet of the two men were very near each other. If a line descended to the ground from the overhead wires it would have been within about two feet of Witt's head and, since Jamerson's feet were close to Witt's his body lay 12 feet or so from the point where the line would have touched the ground. The antenna was between the feet of the two bodies. Mrs. Jamerson testified, "My husband's foot was over the antenna," and added that the latter was somewhat "between the two bodies." The mast, as it lay in its fallen position, took a northerly and southerly position. Its base was near a newly dug hole which had been prepared to receive it.

The television mast with its attached antenna was 28 feet and 10 inches long. The antenna was made of aluminum and consisted in part of crossarms. The mast was of the telescopic kind and was made of steel.

A witness for the plaintiff, John Laurila, Jr., who was an engineer, prepared a plat of the Jamerson property which shows the home, the transmission lines and all other features which the witnesses mentioned. Laurila swore that he measured the distance between the lowest wires and the ground and found it to be 23.20 feet. It is so marked upon his plat which became plaintiff's Exhibit A. He made the measurements November 9, 1955. The fatalities occurred June 7, 1954. No one questions the accuracy of Mr. Laurila's measurement, but Mrs. Jamerson and one of her witnesses, Chester Peden, expressed beliefs

that the wires seemed higher after the causalties than on the day of their occurrence. Mrs. Jamerson thought the power lines at the time of the deaths "were less than 20 feet" above the ground and that later they were raised. She added, "I couldn't say when they did it" and conceded that she saw no work done on the wires at any time after the accident. Mr. Peden, who lives across the highway from the Jamerson property, testified that the wires "appear to be higher than they did on that night" [of the fatalities]. Glen R. Sawyer, manager of the Co-operative, and Robert M. Robbins, the Co-operative's lineman for the McKenzie area, both of whom were called as adverse witnesses by the plaintiff, swore that nothing was done to the lines following the deaths. Both stated that the lines had not been raised or altered in any other way.

Mr. Sawyer testified that the National Electric Safety Code (see *Hillman v. Northern Wasco County People's Utility District,* 213 Or 264, 323 P2d 664) required a clearance of 20 feet for the "three top wires" from the ground, and that the three lower wires of lesser voltage required 16 feet. He added that at a driveway a clearance of 18 feet was required. The wires crossed no driveway.

Witnesses testified that the Co-operative had posted no warnings in the vicinity of the place of the fatalities, but the Co-operative published and distributed monthly to its customers, such as the Jamersons, an eight-page news bulletin which occasionally contained warnings. For example, one of the warnings which was preceded with the heading, "Again, TV Warning" contained, among other information, this:

"A recent report shows that at least 12 persons were killed last year while attempting to install TV antennas or to remove one that had come into

contact with a power line. Don't take chances with your life."

Another of the warnings appeared under a heading which read "Installing TV Antenna. Remember— Caution." It contained among other admonitions these:

"1. Always survey the area for power lines before raising television antenna.

"2. Never install TV antenna under or near electric lines."

The above sentences were in heavy print.

In the area where the Jamersons lived, which was seemingly rugged in character, the houses were few in number. The only one which received mention was the Pedens'.

The foregoing, we believe is a fair review of the evidence. It will be recalled that only witnesses called by the plaintiff testified.

The plaintiff's (appellant's) brief says:

"Witt had a duty to look for electric wires and other possible sources of danger before raising or turning the metallic antenna and mast.

    *   *   *

"It should be observed that it is common knowledge aluminum will conduct electricity and must have been Witt's knowledge, having viewed the TV immediately before in the house of Jamerson that there was electricity in the area.   *   *   * Surely, all of us in this day and age are charged with knowledge that electricity may be dangerous if it escapes from transmission lines."

The complaint made the following charges of negligence against Witt:

" *   *   * That at said time and place, Thomas Ross Witt recklessly, carelessly and without due care and circumspection raised the television antenna directly up and against a high voltage electric transmission line operated, installed and

maintained by Defendant Lane County Electric Co-operative, Incorporated, causing the death of the decedent, Thomas Ross Witt and William Thomas Jamerson who was standing in close proximity."

The answer of each of the two defendants charged that Jamerson was aware of the wires overhead and that he was guilty of negligence in failing to give heed to them.

The plaintiff cites decisions based upon circumstances which, she says, were similar to those mentioned in preceding paragraphs and in which the courts held that deductions could properly be made that the power company was guilty of negligence in having failed to place its wires at a higher level, or in having failed to insulate them. For the purposes of this decision, we shall engage in an assumption, but not a holding, that the evidence could have warranted a finding of negligence upon the part of the Co-operative.

The plaintiff argues that the record indicates that Jamerson took no part in the preparation or erection of the television mast. She claims that Witt alone performed those tasks. According to her, Witt, in raising the mast, negligently brought the antenna into contact with the overhead wires and was thereby electrocuted. She further argues that when Jamerson saw that Witt was stricken, he attempted to rescue him and in that manner was brought to death.

In advancing her argument that Jamerson took no part in the preparation or erection of the television mast, the plaintiff (1) points to the fact that the last time that he was seen alive he was watching Witt at work, and (2) depends upon ORS 41.360(32) which authorizes this presumption:

"A thing once proved to exist continues as long as is usual with things of that nature."

The plaintiff's brief states:

"  *   *   *  Witt was in charge of the installation of the antenna; Jamerson already had a 10 foot antenna and would need Witt for no other reason than to put an antenna in. The normal practice in placing an antenna is for the installer to move it about until a favorable reception is received. This would include turning the mast so that the antenna bars on top would be properly aligned with the wave of the signal generated by the television station. Witt must be presumed to have continued as the installer, that fact being shown, and the fact that he was carrying out the operation while Jamerson merely watched being shown but a short time before the accident. By statutory presumption, O.R.S. 41.360(33) a fact in existence is presumed to continue in existence."

The facts stated in the quoted excerpt need to be supplemented. The evidence indicates that the device known as a field test meter, which Witt brought with him, locates the place where the best television reception can be had. Witt's field test meter was still turned on when Peden came to the scene, although it had been returned to the truck. As is seen from foregoing facts, a hole had been dug for the reception of the base of the mast, thereby indicating that the place for the mast had been selected and the whole had been prepared before the mast was lifted from the truck. It is true that when Mrs. Jamerson saw the two men shortly before the deaths, she though that Witt was working and that her husband was standing nearby. The evidence indicates that Witt had prepared a special mast and was required to fasten its parts together with nuts. When Witt was seen by Mrs. Jamerson doing something to the antenna, the mast was lying upon the truck. When death struck, it had been lifted upright and had been carried toward the hole. A tele-

vision mast similar to the one which was being installed upon the Jamerson premises is an exhibit in this case. It is not light in weight and, with the antenna upon its top, may have been unwieldy.

■ Based upon the quoted disputable presumption, the plaintiff reasons that because Jamerson was standing idle while the mast was lying upon the truck, he continued to remain idle even when the unwieldy mast was being erected. In the meantime, the nature of the work underway changed. The assembly of the television mast was completed, and before death occurred the mast had been taken from the truck and had been lifted into an upright position for installation in the hole that had been dug for the base. The disputable presumption upon which the plaintiff depends is not applicable to an act which is in a state of flux or dependent upon the will of the actor, but rather to the existence of the material object, or the continuance of a more or less static condition like sanity. Wigmore on Evidence, 3d Ed, § 437, says:

"The degree of probability of this continuance depends on the chances of intervening circumstances having occurred to bring the existence to an end. The possibility of such circumstances will depend almost entirely on the nature of the specific thing whose existence is in issue and the particular circumstances affecting it in the case in hand. That a soap-bubble was in existence half-an-hour ago affords no inference at all that it is in existence now; that Mt. Everest was in existence ten years ago is strong evidence that it exists yet; whether the fact of a tree's existence a year ago will indicate its continued existence to-day will vary according to the nature of the tree and the conditions of life in the region. So far, then, as the *interval of time* is concerned, no fixed rule can be laid down; the nature of the thing and the circumstances of the particular case must control."

McCormick on Evidence, § 309, states the rule as follows:

> "When a condition, ordinarily continuing, is shown to exist it is presumed to continue as long as is usual for such a condition. This notion is applied frequently to the continuance of the life of a person, insanity, ownership, possession, agency, and residence. Usually permissive. Reason: probability."

The plaintiff is endeavoring to establish a human act or course of conduct. Whether or not Jamerson lent a hand after the mast had been assembled and Witt had undertaken to raise it is dependent upon the exercise of Jamerson's will. The exercise of his will was dependent, as Wigmore on Evidence, 3d Ed., § 51, states, upon the individual's

> "Character or Disposition;
> Habit or Custom;
> Emotion or Motive;
> Design or Plan;
> Physical Capacity (including Strength and Skill)"

■■ The action of one who is carrying a metal television mast and antenna, of an over-all length of 29 feet, from a truck toward a prepared hole and, in the meantime, raising it upright, might readily induce the owner, who is standing idle nearby, to assist in the operation. ORS 41.360(28), which authorizes a presumption that "things have happened according to the ordinary course of nature and the ordinary habits of life." The presumption upon which the plaintiff depends (ORS 41.360(32)) cannot establish, in our belief, a course of human conduct, such as alleged continued idleness. *Industrial Commission of Ohio v.*

*Carden,* 129 Ohio 344, 195 NE 551, is instructive. There, the plaintiff's case hinged on showing that the deceased was holding onto a shovel when he was struck by lightning, the argument being that he was then in the course of his employment and, therefore, subject to a greater hazard than he would have been had he not been engaged in his job. One witness testified that the deceased had a shovel a short time before the accident. After pointing out that the plaintiff "insisted that a condition once shown to exist is presumed to exist until it is shown to be nonexistent," the court said:

> "The trouble is that counsel endeavors to give a limited rule unlimited application. The rule is succinctly and, as we regard it, correctly stated in 10 Ruling Case Law, 872, Section 15, viz."
>
> " 'When the existence of a person, a personal relation, or state of things is once established by proof, the law presumes that the person, personal relation, or state of things continues to exist as before, until the contrary is shown, or until a different presumption is raised from the nature of the subject in question.'
>
> "Upon analysis it will be seen that this rule of presumption deals only with matters that are reasonably static in nature. To apply the rule to ephemeral matters would not only be the quintessence of asininity but would upset established rules of evidence, the wisdom of which has been tested in the crucible of legal philosophy."

We do not believe that the plaintiff is aided by a presumption that Jamerson remained idle up to the moment of his death.

After the plaintiff has invoked a presumption—which we have found unavailable—that Jamerson remained idle until Witt's alleged handling of the tele-

vision mast had brought it into contact with the overhead wires, she argues that Jamerson, upon seeing Witt's electrocution, came to his rescue, thereby bringing about his own death. The plaintiff's brief quotes the following from *Wagner v. International Railway Co.*, 232 NY 176, 133 NE 437, 19 ALR 1:

> "Danger invites rescue. The call of distress is the summons to relief. The law does not ignore the reactions of the mind in tracing conduct to its consequences. It recognizes them as normal. It places their effect within the range of the natural and probable . . . The wrong that imperils life is a wrong to the injured victim. It is a wrong also to his rescuer."

It will be noticed that the plaintiff, in order to avail herself of the rescuer rule, must show that her decedent did not have his hands upon the television mast when it came into contact with the wires, for if his hands were upon it, he was not a rescuer. There were no burn marks upon Jamerson's hands, and that fact, according to the evidence, may show that his hands held the mast when the contact with the wires occurred.

Jamerson had been familiar for 14 years with the transmission lines overhead that he had authorized the Co-operative in 1940 to string. It will be recalled that the plaintiff's brief says that "it is common knowledge that aluminum will conduct electricity" and that it also says that "all of us in this day and age are charged with knowledge" of the lethal character of electrical current carried by transmission lines. Witt had never before been upon the Jamerson property, and it may be that he had failed to notice the wires. Both the complaint and plaintiff's brief charge Witt with negligence, and one of the specifications of negli-

gence states that he failed to notice the wires. June 7, 1954, was a rainy day and at the hour of the fatality a heavy mist was falling. The grass in which the two men stood was wet and, therefore, any contact by the antenna with the wires would hazard the lives of the two men. If Jamerson saw that Witt failed to notice the wires and saw him bring the antenna into contact with them while he (Jamerson) remained idle, Jamerson, upon seeing the electrocuted man fall, could not assume the role of a rescuer as set forth in the Wagner decision. Restatement of the Law, Vol 2, Torts § 472, p 1242, Comment A, says:

> "A plaintiff who intervenes to rescue a third person is not affected by the fact that the third person's own negligence has been a legally contributing cause in putting him in peril. On the other hand, if the third person's peril is due in part to the plaintiff's own neglience, such negligence is a contributing factor in producing any harm which he sustains in attempting to rescue the third person and, therefore, is a bar to his recovery against the defendant whose negligence also contributed to such harm."

■■ Witt was a business invitee of Jamerson. It was the latter's duty to have his premises in reasonably safe condition for his invitee, or give the invitee notice of defects. According to the plaintiff, the wires were too low and were not insulated. If we may assume the truth of that charge, Jamerson should have warned Witt. It is, therefore, our belief that the plaintiff cannot avail herself of the rescuer doctrine.

We shall now consider whether Jamerson was guilty of contributory negligence. *Bockman v. Mitchell Bros. Truck Lines.* 213 Or 88, 320 P2d 266, had features which, in essentials, were substantially akin to those of the

case at bar. In holding that the plaintiff was guilty of contributory negligence, this court said:

"In contending that plaintiff was negligent as a matter of law, defendant relies on the following rule stated in Carroll v. Grande Ronde Electric Co., 47 Or. 424, 443, 84 P. 389, 394, 6 L.R.A., N.S., 290:

" ' * * * the rule of law is that the one who voluntarily assumes a position of danger, the hazards of which he understands and appreciates, cannot recover for an injury from a risk incident to the position. Fitzgerald v. Connecticut River Paper Co., 155 Mass. 155, 29 N.E. 464, 31 Am.St.Rep. 537; Robinson v. Manhattan Ry. Co., Com.Pl., [5 Misc. 209,] 25 N.Y.S. 91.' "

The following decisions applied and illustrate still further the rule announced in the Carroll case and applied in the Bockman decision: *LeVonas v. Acme Paper Board Co.*, 184 Md 16, 40 A2d 43; *Hamilton v. Southern Nevada Power Co.*, 70 Nev 472, 273 P2d 760; *Pfahler v. Pennsylvania Power & Light Co.*, 351 Pa 287, 40 A2d 692; *Aljoe v. Penn Central Light & Power Co.*, 281 Pa 368, 126 A 759; *Hale v. Montana-Dakota Utilities Co.*, 192 F2d 274 (C A 8th).

■ Jamerson, as we have said, knew of the transmission wires and had, in fact, lived with them for fourteen years. The brief submitted by the plaintiff declares that all today know of the danger that lurks in lines of that kind. For a half hour or so, while the two men were finding a place to erect the television mast and Witt was performing incidental tasks, the wires were overhead and in plain sight. They cried out their own warning. If Jamerson met death when he had his hands on the mast while it was carried toward the wires, the plaintiff cannot recover. If Jamerson did not have his hands on the mast, but saw Witt,

oblivious of the wires, carry the mast into the wires, he should have warned Witt of the danger. In either event, Jamerson was guilty of negligence.

In setting forth the above analysis of the contentions submitted by the plaintiff's resourceful counsel, we have not embraced those versions of the situation as our own.

We have found no error. The two assignments of error are dismissed as lacking in merit. The judgment of the circuit court is affirmed.

LUSK, J., specially concurring.

I concur in the result. As the opinion of the court discloses, the whole case of the plaintiff depends upon speculation and conjecture. The record is devoid of evidence of negligence of anyone. In that situation, I think that we should not make a finding of contributory negligence based upon unproven hypotheses. It suffices that the plaintiff failed to prove the negligence alleged.