Argued June 9; reversed July 7; rehearing denied
September 8, 1943

VARLEY *v.* CONSOLIDATED TIMBER CO.

(139 P. (2d) 584)

Before BAILEY, Chief Justice, and BELT, ROSSMAN, KELLY, LUSK, BRAND and HAY, Associate Justices.

*Arthur E. Prag,* of Portland (LeRoy L. Lomax, of Portland, on the brief) for appellant.

*Randall B. Kester,* of Portland (Maguire, Shields, Morrison & Biggs, of Portland, on the brief) for respondent.

BAILEY, C. J. The plaintiff, Edith M. Varley, has appealed from a judgment entered in favor of the defendant, Consolidated Timber Company, pursuant to chapter 309, Oregon Laws 1941, notwithstanding verdict and judgment in favor of the plaintiff.

After both parties to the litigation had rested the case the defendant moved for a directed verdict in its favor, on the ground that the plaintiff was, at the time she was injured, a trespasser or a bare licensee on the right of way of the defendant company and that there was no evidence that she was injured by a wilful or wanton act of the defendant, and on the further ground that the plaintiff was chargeable with contributory negligence. The motion was denied, and the jury returned a verdict in favor of the plaintiff, accompanied by special findings. Judgment was entered thereon in favor of the plaintiff. Thereafter the defendant moved for judgment in its favor notwithstanding the verdict and for a new trial. Argument was heard by the Honorable Walter L. Tooze, circuit judge pro tempore, who presided at the trial, and the Honorable James W. Crawford, circuit judge. The two judges allowed the motion for judgment notwithstanding verdict and denied the motion for a new trial.

In passing upon the propriety of the court's action in entering judgment for the defendant, we must determine whether the evidence was sufficient to justify a verdict in favor of the plaintiff. The evidence, therefore, must be viewed in the light most favorable to the plaintiff.

The defendant is a corporation engaged in logging operations in burned-over areas of Tillamook, Washington and Clatsop (and perhaps Columbia) counties. In this connection it maintains a logging railroad ap-

proximately nineteen miles in length. The corporation's principal office and equipment are located at Glenwood, in Washington county, which place is also the principal terminal of the logging railroad.

In logging the areas mentioned the defendant is assisted by five or more independent logging contractors, among them the firm of Converse & Hickman. The logging show assigned to the latter company is located on one of the branches of the logging railroad. Other independent contractors are located on the main line and other branches of the railroad. The defendant corporation hauls logs for the independent contractors with its own rolling equipment, and in addition provides at least part of their transportation of men and supplies. The contractors have a right to operate on the logging railroad their own light rolling equipment.

The camp of Converse & Hickman is situated about a mile and a half from Vanderjack's landing, the terminal of the railroad branch on which the company's logging show is located. From the camp to the landing there is a descending grade of approximately three per cent, and for about three miles above the camp there is a three per cent ascending grade. The camp has no means of ingress or egress except the logging railroad.

■ Mrs. Varley had charge of the cook-house at the camp under a contract with Converse & Hickman. She furnished meals for that company's employees at the camp, who numbered forty-four or forty-five when she was injured. At times she also provided meals for employees of the defendant corporation working in that vicinity. The trial court properly ruled that she was an independent contractor, and not an employee of either Converse & Hickman or the defendant. It was admitted by the defendant that the business con-

ducted by the plaintiff was a necessary adjunct to the logging operations of Converse & Hickman.

All the supplies used in preparing meals for the loggers were furnished by Mrs. Varley. On that account it was necessary for her to leave the camp every two weeks to do marketing and shopping. She was usually taken from the camp to Vanderjack's landing by Dan May, an employee of Converse & Hickman. Sometimes she was transported on a speeder owned by Converse & Hickman, and at other times on a push-car owned by May. In going from the camp to the landing, the push-car was propelled by gravity only, with a two-by-four or other like piece of wood serving as a brake. It was returned to camp by use of a motor speeder. Mrs. Varley and her purchases were generally brought to the camp from Glenwood by employees of the defendant corporation.

May was "bull cook" at the Converse & Hickman camp. His duties were "to take care of the bunk-houses, make beds, sweep floors, get in the wood for the bunk-houses, get in the wood for the cook-house" and to "haul the supplies in when" convenient. He also transported Mrs. Varley and the employees of Converse & Hickman between that company's camp and the landing, either on the speeder or the push-car or both. On October 18, 1940, at the time of the accident involved herein, May was carrying out camp laundry as well as transporting Mrs. Varley.

At about nine-thirty o'clock in the morning of that day, Mrs. Varley left the camp with May and Nels Johnson, on May's push-car. When they were about half-way to Vanderjack's landing, and proceeding at the rate of four or five miles an hour, they were over-taken by a push-car loaded with rock and dirt, which

was traveling down the incline at a speed estimated at from fifty to seventy miles an hour. In the collision Mrs. Varley suffered severe injuries.

A section crew employed by the defendant corporation had been using the latter push-car and left it standing on the tracks about a quarter of a mile above the Converse & Hickman camp and approximately a mile above the place of collision, without putting out a torpedo, posting a signalman or taking other precautions to warn approaching trains and other rolling equipment of the presence of the push-car on the tracks. A logging train on its way down to the Converse & Hickman camp unexpectedly ran into the push-car, causing it to roll down the tracks, wholly out of control, until it collided with May's push-car.

The logging camp of Converse & Hickman commenced operating on or about June 20, 1940. From that time until the day she was injured Mrs. Varley was in charge of the cook-house at the camp. May also began working there at the same time as did Mrs. Varley.

A speeder furnished by the defendant corporation was used for transporting employees and supplies for the Converse & Hickman camp at the beginning of its operations. Shortly thereafter May purchased a push-car, and a week or two later Converse & Hickman purchased a speeder. During every working day May made a trip to and from the landing, either on his push-car or on the speeder, to take down and bring back people working at the camp, carry laundry or do other errands. On some Sundays he made as many as five trips to the landing to transport members of the logging crew, and took as many as eighteen men at a time. At times he was ordered to go to the landing

by Mr. Hickman, and at other times by Mr. Converse. The record is silent as to whether May was paid any extra compensation for making such trips or whether the camp workers paid for transportation.

The plaintiff alleges as negligence on the part of the defendant, among other acts, its failure to warn the approaching train of the presence of the section crew's push-car on the tracks. On the trial the defendant admitted that this was negligence. It seeks, however, to defeat recovery by the plaintiff on the alleged ground that she was at the time of being injured a trespasser or licensee on the defendant's property, and that her injuries were not caused by any wilful or wanton negligence of the defendant. In this connection the defendant asserts that at the time of the mishap May was operating his push-car on the defendant's right of way in violation of the logging safety code promulgated by the state industrial accident commission of Oregon pursuant to title 102, chapter 12, article 3 (§§ 102-1228 to and including 102-1246), O. C. L. A., and particularly in violation of rule G-22(d) of the safety code.

Before discussing the question of whether May was operating his push-car in violation of the safety code, we shall consider the status of the plaintiff while on the defendant's property, especially while using its railroad branch line. It is admitted by the defendant that it and the independent contractors were joint users of the right of way "in this respect, the Consolidated operated the train, and these others operated their speeders and this one push-car. Consolidated operated speeders, too."

The logging show of Converse & Hickman was in the depths of a forest, remote from highways and roads

and without any means of ingress or egress except the defendant's right of way. In order for Converse & Hickman to obtain or keep workmen, bring in supplies or transact other business incidental to its logging operations, that company had to use the railroad right of way. Such use was known to the defendant and was of benefit to it, for the reason that the defendant profited from the operations of Converse & Hickman and the other independent contractors. Mrs. Varley's operation of the cook-house was, as above stated, admitted by the defendant to be a necessary adjunct to Converse & Hickman's logging business. Those who worked at the Converse & Hickman camp were not trespassers or merely licensees in using the right of way, but were invitees. They were on the property by the invitation, either express or implied, of the defendant corporation, and were not there merely by permission or tolerance: *Nickson v. Oregon-American Lumber Company*, 127 Or. 326, 345, 266 P. 254, 271 P. 986; *Lange v. St. Johns Lumber Company*, 115 Or. 337, 343, 237 P. 696; 4 Shearman and Redfield on Negligence, Rev. Ed., § 779, page 1783, and § 781, page 1793.

The provisions of the logging safety code on which the defendant relies in support of its contention that the plaintiff and May were unlawfully on its right of way at the time of the accident are the following:

"G-16. *Speeders* shall have a brake system which, under ordinary circumstances, will hold on any grade over which they operate. Large speeders shall be equipped with standing devices operating for both directions of travel. Speeder trailers shall be equipped with a safety chain or strap.

"(b) Operators shall examine their equipment daily or in every case of taking the equipment over,

and shall not move it until it is in safe working condition. They shall not coast out of gear at any time unless the speeder is equipped with a friction clutch.

"G-17. *Satisfactory Brakes* shall be installed and maintained on all railroad cars, trucks and other rolling stock.

" (b) Hand brakes shall be provided on all cars and trucks, and shall be easily accessible when cars are loaded. All hand brake equipment shall be of such type that brakes can be fully applied without more than hand power leverage on a 24-inch hickey or lever.     *     *     *

*     *     *

"G-21. *All Rolling Stock* shall be maintained in good working condition. Defective cars or trucks with unsafe brakes, sharp-flanged or defective wheels, defective handholds, steps or footboards, broken decking, unsafe bunks or other conditions which render the use of the equipment as hazardous, shall be set out and not again put in use until repaired.

*     *     *

"G-22. *A Satisfactory Dispatching System* shall be established and followed on all logging railroad operations.

*     *     *

" (d) No train or speeder shall proceed at any time without proper clearance, unless the telephone is out of order. In that event they shall proceed with the greatest caution, using a flagman where visibility is impaired."

The foregoing rules and regulations have the effect of law § 102-1241, O. C. L. A.; and any violation thereof is punishable by a fine of not more than one hundred dollars or by imprisonment in the county jail for not more than six months or by both such fine and imprisonment, in the discretion of the court: § 102-1243, O. C. L. A.

One of the principal questions presented for decision is whether it is required that a clearance be obtained before operating a push-car such as the one owned by May. Subdivision (d) of rule G-22 refers only to trains or speeders. It is argued by the defendant that it was the intention of the accident commission either to include push-cars within the designation "train or speeder", or by omitting to mention push-cars to exclude them entirely from the use of railroad rights of way.

In *Kirk v. Farmers' Union Grain Agency*, 103 Or. 43, 47, 202 P. 731, this court, in passing upon an attempt to extend a penal statute by implication, said:

"In construing penal statutes, the legislative intent is in most cases to be found by giving to the words the meaning in which they are used in ordinary speech: Sarlls v. United States, 152 U. S. 574 (38 L. Ed. 557, 14 Sup. Ct. Rep. 720).

\* \* \*

"This statute can not be enlarged by construction. All provisions of a penal statute are to be construed according to the fair import of their terms: Section 2409, Or. L. A criminal statute is not extended by implication. In order to brand the defendants as felons, it would be necessary to extend the meaning of the Blue Sky Law by construction. This we can not do.

" 'There can be no constructive offenses,' said Mr. Chief Justice Fuller, 'and before a man can be punished his case must be plainly and unmistakably within the statute.' United States v. Lacher, 134 U. S. 624 (33 L. Ed. 1080, 10 Sup. Ct. Rep. 624).''

The court in *Sarlls v. United States*, 152 U. S. 570, 38 L. Ed. 556, 14 S. Ct. 720, cited in the above quoted excerpt, observed:

". . . The danger of substituting for the meaning of a penal statute, according to the popu-

lar and received sense, the conjecture of judges as to a supposed mischief to be corrected, is pointed out by Chief Justice Marshall, when, in the case of United States v. Wiltberger, 5 Wheat. 76, 96, he said: 'To determine that a case is within the intention of a statute, its language must authorize us to say so. It would be dangerous, indeed, to carry the principle that a case which is within the reason or mischief of a statute is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of a kindred character, with those which are enumerated. If this principle has ever been recognized in expounding criminal law, it has been in cases of considerable irritation, which it would be unsafe to consider as precedents forming a general rule for other cases.' ''

Again, in *State v. Bailey*, 115 Or. 428, 236 P. 1053, we find this statement:

"A criminal offense can not be created by inference or implication. Nor can the embrace of a criminal statute reach beyond the plain import of the language used: State v. LeBlanc, 115 Me. 142 (98 Atl. 119).

"A valid criminal law must definitely show with reasonable certainty what acts or omissions the law-making body intended to prohibit and punish": citing authorities.

All the witnesses who testified on the point made a similar distinction between push-cars and speeders, which is thus described in the testimony of Mr. Stendl, train-master of the defendant corporation:

"A speeder is a vehicle that is portable, that is, equipped with wheels to run upon a rail, propelled by either gasoline or Diesel or some other power; it is a power vehicle.

"Q. A push-car is pushed; there is no power in that?

"A. No, only the push of manpower."

May's push-car was constructed of four wheels and a platform and weighed about one hundred seventy-five pounds. There can be no serious contention that an object such as that is a train or a speeder within the meaning of the safety code. Yet the defendant argues that the safety code was promulgated for the purpose of protecting workmen engaged in logging operations on railroads and that therefore the rules should be interpreted to include push-cars as well as speeders and trains.

We are not able so to construe the rules without reading into them something which they do not contain. There may be many reasons why the accident commission did not provide that push-cars be moved on rights of way only after clearance obtained for that purpose. Such cars are used by section crews in track repair and maintenance work, and it would be impracticable for those crews to obtain clearance every time before moving them. The record discloses that the defendant did not require its section crews to obtain clearance at all for moving push-cars on its tracks. Its explanation is that those cars when empty can be lifted off the tracks to allow other traffic to pass. That was true also of May's push-car.

■ Our conclusion is that the safety code does not require clearance for moving push-cars on logging railroads. Nor is the fact that such code is silent as to push-cars to be construed as an inhibition against their use at all on those railroads.

■ Rule G-17 requires satisfactory brakes to be "installed and maintained on all railroad cars, trucks and

other rolling stock." There is no evidence that the braking device used on May's push-car was not efficacious. At the time of the accident that push-car was proceeding down-grade at a rate of four or five miles an hour. There is no contention that it was then, or had ever been, out of control on the tracks. Nor is there any evidence that the method employed on May's push-car was not a satisfactory and usual way of applying a brake. We can not say as a matter of law that the braking device used by May did not meet the requirements of the logging safety code.

We do not intend, by our discussion of the safety code, to imply that, had the provisions regarding clearance been applicable to push-cars or had the brake on May's push-car been unsatisfactory, the plaintiff would have been a trespasser. On that question we express no opinion.

■ Upon consideration of the whole record we hold that Mrs. Varley was lawfully on the defendant's right of way and was its invitee thereon, to whom it owed the duty of ordinary care; that the proximate cause of the accident to Mrs. Varley was the negligence of the defendant; and that she in no way contributed to her injury. It follows, therefore, that the circuit court erred in setting aside the judgment in favor of the plaintiff and entering one for the defendant.

■ At the conclusion of its brief the defendant calls attention to the fact that it filed a motion for a new trial as well as one for judgment notwithstanding verdict, and that the court in sustaining its motion for such judgment "did not pass upon the *merits* of the motion for a new trial". It is suggested that in the event of a reversal of the judgment appealed from the cause "be remanded for the trial court to pass upon the

merits of the motion for new trial, with leave to defendant to appeal from the judgment in the event the motion for new trial is denied." The defendant states that this court has indicated that such procedure is proper under similar circumstances, and in support of its assertion cites *Fisk v. Henarie*, 15 Or. 89, 13 P. 760; *Apex Transportation Company v. Garbade*, 32 Or. 582, 593, 52 P. 573, 54 P. 367, 62 L. R. A. 513; and *Bertin & Lepori v. Mattison*, 81 Or. 482, 159 P. 1167. The action suggested, the defendant says, seems to be the uniform practice in other states and has been approved by the United States supreme court in *Montgomery Ward & Co. v. Duncan*, 311 U. S. 243, 85 L. Ed. 147, 61 S. Ct. 189.

Prior to the enactment of chapter 309, Oregon Laws 1941, the only grounds on which judgment notwithstanding verdict could be entered were that it appeared from the pleadings that the court did not have jurisdiction of the subject of the action or of the person of the defendant, and "that the facts stated in the pleadings of the plaintiff or defendant, as the case may be, do not constitute a cause of action or defense": § 6-707, O. C. L. A. The 1941 amendment of this section (chapter 309, *supra*) permits judgment notwithstanding verdict to be entered after verdict and judgment thereon when a motion for a directed verdict which should have been granted has been denied and a verdict has been rendered against the movant. This amendment also provides that, "In any case where, in the opinion of the court, a motion for a directed verdict ought to be granted, it may nevertheless, at the request of the adverse party, submit the case to the jury with leave to the moving party to move for judgment in his favor if the verdict is otherwise than as would have been directed."

In the instant case the defendant moved for a directed verdict in its favor. That motion was denied and the jury returned a verdict in favor of the plaintiff. Thereafter the defendant filed a motion for a new trial and in addition a motion for judgment notwithstanding verdict. In granting the latter motion the trial court also denied the motion for a new trial, but did not pass upon the merits of that motion. The defendant, therefore, has not had the benefit of a decision on the merits of its motion for a new trial.

The 1941 amendment (chapter 309, *supra*) raises a new question concerning procedure. Decision on a motion for a directed verdict made after the completion of taking testimony is, under the 1941 amendment, in many instances postponed until the verdict is rendered. The litigant may be of the opinion that the evidence is insufficient to support the verdict for the adverse party and at the same time may believe that error prejudicial to himself has been committed. He does not desire to waive either objection.

Rule 50 (b) of the federal rules of civil procedure is similar to the amendment added to § 6-707, O. C. L. A., by chapter 309, *supra,* with the exception that it provides that a motion for a new trial may be joined with a motion for judgment notwithstanding verdict. In *Montgomery Ward & Co. v. Duncan,* supra, both motions were made. That for judgment notwithstanding verdict was granted, but no action was taken by the trial court on the motion for a new trial. A question arose as to what procedure should be followed in the event that the judgment notwithstanding verdict be reversed on appeal. The opinion therein thus discusses the matter:

"The rule contemplates that either party to the action is entitled to the trial judge's decision on

both motions, if both are presented. A decision in favor of the moving party upon the motion for judgment ends the litigation and often makes it possible for an appellate court to dispose of the case without remanding it for a new trial. If, however, as in the present instance, the trial court erred in granting the motion the party against whom the verdict went is entitled to have his motion for a new trial considered in respect of asserted substantial trial errors and matters appealing to the discretion of the judge. In this case the reasons assigned in support of the motion for a new trial were in both categories. The grounds assigned for a new trial have not been considered by the court. In the circumstances here disclosed the uniform practice in state appellate courts has been to remand the case to the trial court with leave to pass upon the motion for new trial."

Authorities from many jurisdictions are cited in the footnote, in support of the above statement. Further on in its opinion the court observes that, had the trial court passed upon both motions, it could "see no reason why the appellee may not, and should not, cross-assign error, in the appellant's appeal, to rulings of law at the trial, so that if the appellate court reverses the order for judgment *n. o. v.*, it may pass on the errors of law which the appellee asserts nullify the judgment on the verdict." This suggested method of obtaining a ruling of the appellate court on the errors assigned as grounds for a new trial does not appear available to the respondent in this state without further legislation.

In remanding the above case for a new trial the court observed:

". . . The provision which is involved in this case substantially follows the first state [Minnesota] statute to authorize such procedure. The supreme court of that state has construed the

statute to permit the trial judge to pass on the motion for judgment, leaving the motion for a new trial for later disposition. In the event that his decision is reversed, the practice is to remand the cause with leave to the trial judge to pass upon the motion for a new trial. It was therefore not unnatural for the defendant to advocate that course, or for the trial judge to follow it.

"In the circumstances, we think the failure of the district court to rule in the alternative on both matters can be cured without depriving the defendant of opportunity to have its motion for a new trial heard and decided by the trial court, by modifying the judgment below to provide that the cause be remanded to the district court to hear and rule upon that motion."

In one of the Minnesota cases cited in the footnote to the quoted opinion, namely, *Kies v. Searles,* 146 Minn. 359, 178 N. W. 811, a motion for a new trial was denied and a motion for judgment notwithstanding verdict was allowed. On reversal of the judgment the cause was remanded to the trial court for consideration of the motion for a new trial, for the reason, as stated in the opinion therein, that:

". . . A new trial could not have been granted consistently with the granting of judgment; and the denial of a new trial, while in a way consistent, accomplished nothing. The denial was only formal. The plaintiff should not be concluded by it."

The procedure adopted by the United States supreme court in *Montgomery Ward & Co. v. Duncan,* supra, is in accord with that of many state courts, as indicated by the authorities cited in the footnotes to that decision. Special attention is here directed to two of the cases there cited, *Osche v. New York Life In-*

surance Company, 324 Pa. 1, 187 A. 396, and McLain v. Easley, 146 Wash. 377, 262 P. 975, 264 P. 714. Those differed from the case at bar only in that the trial court in each instance in granting the motion for judgment notwithstanding verdict did not rule on the motion for a new trial. Although in the case at bar the trial court formally ruled upon the motion for a new trial, it did not consider the same on its merits. The result is as though there had been no ruling upon that motion.

This court in *Fisk v. Henarie,* supra, approved procedure somewhat similar to that suggested by the defendant. In that case a motion for a new trial and a motion for judgment notwithstanding verdict were filed at the same time. The motion for judgment was granted, but no action was taken on the motion for a new trial. Upon reversal of the judgment on appeal this court held that the motion for a new trial was still pending; and the cause was remanded to the trial court with permission to the movant to argue that motion. See, also, in this connection, *Bertin & Lepori v. Mattison,* supra.

Section 5-802, O. C. L. A., grants to a litigant who is aggrieved by the judgment entered against him the right to move to have the judgment set aside and a new trial ordered, for certain enumerated reasons. The motion for that purpose must be filed within ten days after the filing of the judgment and if not heard and determined by the court within fifty-five days from the entry of the judgment, the motion shall "conclusively be taken and deemed as denied": § 5-803, O. C. L. A. It was not the intention of the legislature in enacting the 1941 amendment to deprive litigants of the right to move for a new trial. The course of

proceeding to be followed when both a motion for judgment notwithstanding verdict and a motion for a new trial are filed is not specifically pointed out by statute, and we therefore adopt the procedure which appears "most conformable to the spirit" of the code: § 13-715, O. C. L. A.

Our mandate herein will provide for setting aside the judgment appealed from and entering judgment in favor of the plaintiff, with permission to the defendant to present its motion for a new trial, heretofore filed. That motion is to be treated as though no ruling had thereon been made. No new grounds may be assigned for requesting a new trial. Nor may any matters contained in the motion as filed be passed upon, if the same were or could have been considered on this appeal. If not acted upon by the court within fifty-five days after the entry of judgment on this mandate, the motion for a new trial shall be deemed denied. Nothing herein said is to be construed as preventing the plaintiff from having the motion set down for argument. The appellant is entitled to costs in this court.