Argued May 6, 1957, affirmed March 26, petition for rehearing
denied April 23, 1958

# HILLMAN *v.* NORTHERN WASCO COUNTY PUD

323 P. 2d 664

267

*William G. Dick,* The Dalles, argued the cause for appellant. On the brief were Dick & Dick, The Dalles.

*H. M. Schwab,* Portland, argued the cause for respondent. On the brief were Dusenberry, Teiser, Martin, Schwab & Beatty, Raymond M. Kell and Clifford B. Alterman, Portland.

Before Perry, Chief Justice, and Lusk, Brand, McAllister and Kester*, Justices.

## McALLISTER, J.

The plaintiff, Les Hillman, brought this action against the Northern Wasco County People's Utility District to recover damages for personal injuries. The defendant is a quasi-municipal corporation engaged in the distribution and sale of electrical energy in a district which includes The Dalles and adjacent territory. While plaintiff was engaged in removing two beams from the wall of a burned-out building he re-

---

* Resigned March 1, 1958.

ceived a shock from an adjacent electrical installation maintained by defendant and fell from the wall. The jury returned a verdict for plaintiff in the sum of $82,500.

After the entry of a judgment for plaintiff, the defendant moved for a judgment notwithstanding the verdict and in the alternative for a new trial. The court denied the motion for judgment n.o.v. but granted the motion for new trial. The plaintiff has appealed from the order setting aside the judgment and granting a new trial and the defendant has cross-appealed from the order denying the motion for a judgment n.o.v.

The accident occurred on December 21, 1952 in an alley running east and west through the center of a block in the business district of The Dalles. The alley ran from Washington street on the west side of the block to Federal street on the east. A brick building had originally extended along the entire south side of the alley. In about 1933 the interior of the east half of the building had burned out but the outer wall extending along the alley remained standing. After the fire only the west half of the building was used.

In about 1949, the defendant installed a main electrical transmission line through this alley. As a part of this installation, the defendant erected a transformer platform at a point about halfway through the alley. Two power poles were placed about 10 feet apart at the south edge of the alley close to the wall. The rear wall of the building occupying the west half of the property joined the wall along the alley at a point about midway between these two poles. The westerly pole stood alongside the occupied portion of the building and the easterly pole alongside the wall of the gutted portion of the building.

The wall was about 39 feet high and the poles were

about 34 feet high. A few feet below the top of the poles a crossarm fastened to the side of the poles next to the wall extended between the poles parallel to and within a few inches of the wall. With one end resting on this parallel crossarm, another crossarm about four feet in length extended vertically from the wall toward the center of the alley. On this vertical crossarm there were installed at intervals three devices known as "pot-heads" which in general appearance resemble large insulators. Out of the top of each pothead there extended a short, heavy copper wire known as a "pigtail." The pigtails and the top portion of the potheads were not insulated and carried about 12,470 volts of electricity between conductors. Each pothead was connected to the main transmission line and was installed to serve as a connection between the transmission line and a transformer but no transformers had been installed on this platform. The southerly pothead was about 14 inches from the building wall and contact with the pigtail of this pothead caused plaintiff's injury. The main transmission line was described as an aerial cable consisting of four wires wrapped together and was suspended from other vertical crossarms placed on the pole about three feet above the crossarm bearing the potheads. The cable and the wires leading from it to the base of the potheads were insulated and under normal conditions could be touched without danger.

Some time prior to the accident, the owner engaged a building contractor named McManigle to erect a new building on the east half of the property. Before construction of the new building could start, it was necessary to tear down the old brick wall along the east half of the alley. The job was complicated by two beams which extended vertically from the wall near

the top thereof to the opposite wall of the gutted building. It appears that McManigle's regular employees erected a scaffold and removed the top of the wall down to a height of about 32 feet which left exposed the ends of the two beams as they rested on the wall.

The plaintiff, Les Hillman, was about 36 years of age at the time of the accident and had lived in The Dalles for several years. He and his wife operated a paint store known as the "Pot and Brush" located in the building on the west half of the property described above. In addition, Hillman and a partner, Gene Merrion, were engaged in business as painting contractors. Hillman had also done occasional jobs around The Dalles as a high-climber but the precise extent of his experience in that field is not disclosed. As a painter and a high-climber, Hillman had worked at times around electrical wires and electrical installations and occasionally received electric shocks which he said "most painters do."

In his complaint, Hillman alleged that he was employed by the builder McManigle to remove the beams from the wall, but as a witness, Hillman testified that he contracted with McManigle to do the job at a fixed price and was free to employ such help as he wanted. Hillman and his partner, Gene Merrion, started to remove the beams on a Sunday morning. Plaintiff climbed upon the scaffolding and fastened a cable to the more easterly of the two beams. The scaffolding was then removed so that it would not be damaged by the falling beams. Hillman found his own truck too light for the job and hired a tow truck equipped with a winch to pull down the beams. The tow truck was operated by one of the owners thereof named Wolgamot. The first beam was pulled down by the tow truck. This left exposed a steel plate which had been im-

bedded in the wall and on which the beam had rested. This plate was about 18 inches wide, three feet long and weighed about 120 pounds.

Using a ladder, Hillman then climbed up and fastened a cable to the remaining beam which was near the rear wall of the building. He then decided to push the steel plate on which the easterly beam had rested off the wall. Hillman thought that the plate might fall when the second beam was pulled loose and cause injury or damage. In order to get to the steel plate, plaintiff climbed over the wall and stepped onto the parallel crossarm of defendant's transformer platform. Plaintiff then stepped sideways along the crossarm to the east until he reached the steel plate. Plaintiff was then near the southerly end of the vertical crossarm on which the potheads were installed and his feet were near the base of the southerly pothead. As he stood on the crossarm the top of the wall was just below plaintiff's belt. Plaintiff testified that he then put his left leg on the top of the wall, steadied himself with his right hand and with his left hand attempted to push the plate off the wall. In that position, plaintiff's right leg was hanging free and while he was so engaged, his right heel apparently touched the pigtail or the top of the southerly pothead. Plaintiff received a severe shock and fell off the wall onto the ground inside the building. As a result of the shock and fall, plaintiff was seriously injured.

Plaintiff's only assignment of error is the granting of defendant's motion for a new trial. The motion for new trial specified seven alleged errors as grounds therefor and the trial court concluded that it had committed prejudicial error in four of the particulars specified in the motion.

 It is settled law in this state that an order for

new trial made on motion of the party aggrieved need not state the ground or reason on which the order is based. The order granting a new trial will not be reversed if it should be sustained on any ground assigned in the motion whether referred to in the order or not. The burden is on the party seeking to reverse an order granting a new trial to show that none of the grounds specified in the motion is well taken. *Correia v. Bennett and Johnson et ux,* 199 Or 374, 384, 261 P2d 851; *Bartholomew v. Oregonian Pub. Co.,* 188 Or 407, 411, 216 P2d 257; *Smith v. Pacific Truck Express,* 164 Or 318, 323, 100 P2d 474; *Zeek v. Bicknell,* 159 Or 167, 169, 78 P2d 620; *Arthur v. Parish,* 150 Or 582, 586, 47 P2d 682; *Cicrich v. State Ind. Acc. Comm.,* 143 Or 627, 635, 23 P2d 534.

It is also well settled that where error has been committed a motion for new trial is addressed to the sound discretion of the trial court and an order granting such motion will be reversed only for a manifest abuse of that discretion. A much stronger showing is required to authorize a reversal of an order granting a new trial than to reverse an order denying a motion therefor. *Burrows v. Nash,* 199 Or 114, 259 P2d 106 and *Clark v. Fazio et al.,* 191 Or 522, 230 P2d 553.

The first two errors assigned in the motion for new trial involve the legality of the adoption of the national electrical code and the national electrical safety code as the electrical code and electrical safety code for Oregon. In his second amended complaint, the plaintiff alleged that the defendant in the installation and maintenance of its electrical transmission line and the devices installed on its transformer platform had violated both codes and the court instructed the jury that a violation of the codes in the particulars alleged would be negligence per se. The defendant contended that the

adoption of both codes constituted an unlawful delegation of legislative power. These errors were assigned by the trial court as two of the grounds for granting the new trial.

■ We will first consider the validity of the national electrical code. Oregon Laws 1919, ch 163, p 226 provided that all electrical installations in this state should be made in accord with the rules laid down by the United States Bureau of Standards. This act was amended by Oregon Laws 1935, ch 318, p 488 to provide that the national electrical code, as approved by the American Standards Association, should be the electrical code of Oregon. The act was further amended by Oregon Laws 1949, ch 83, p 93 and the portions pertinent to this case were later codified in the Oregon Revised Statutes, as follows:

ORS 479.420. "After May 29, 1919, all installations in Oregon of wires and equipment to convey electric current, and installations of apparatus to be operated by such current, excepting communicating wires and apparatus, shall be made in substantial accord with the National Electrical Code as approved by the American Standards Association and rules and regulations promulgated by the Commissioner of the Bureau of Labor relating to such work so far as the same covers both fire and personal injury hazards, as they are compiled and published from time to time. * * *"

ORS 479.430. "The Commissioner of the Bureau of Labor shall obtain and keep on file in his office a copy of the latest edition of the National Electrical Code relating to the installation of wires and equipment to convey electric current and of electrical apparatus to be operated by such current, so far as the same covers fire and personal accident hazards, as promulgated and issued by such bureau, and shall have printed and certify to and deliver to all persons licensed under the pro-

visions of ORS chapter 694, and, upon request, to the general public, at cost, copies of such code. For the purposes of ORS 479.410 to 479.450, 651.050, 651.230 and ORS chapter 694, the latest edition of the National Electrical Code as on file in the office of the commissioner on July 1 of each year shall constitute the state electrical code for the following fiscal year. A printed copy of such code, certified to as such by the commissioner shall be received in any court of the state as conclusive evidence of the contents of the original on file in the office of the Commissioner of the Bureau of Labor upon the date named in the certified copy."

There are three provisions of our constitution pertaining to and limiting the exercise of legislative power. Article III, § 1 divides the powers of government among three departments, the legislative, the executive, including the administrative, and the judicial and prohibits each department from exercising any of the powers conferred on the others. Art IV, § 1 vests the legislative authority of the state in the legislature subject only to the initiative and referendum powers reserved by the people. Art I, § 21 prohibits the passage of any law "the taking effect of which is made to depend upon any authority" except as provided in the constitution.

The scope and purpose of the limitations on the power of the legislative department imposed by the constitutional provisions mentioned above are clearly stated in *Van Winkle v. Fred Meyer, Inc.,* 151 Or 455, 461, 49 P2d 1140. In that case this court held unconstitutional a statute which provided that marketing agreements when formulated and approved by a substantial majority of the persons engaged in a particular business or industry covered by the act, should upon approval by the governor have the force and

effect of law. In holding that the act was unconstitutional, the court said:

"* * * In granting these coercive and unrestrained powers to an indefinite and indeterminate group of persons, the act contains no limitation or restriction upon the exercise by them of the powers so conferred, nor does it prescribe any definite or intelligible rule, standard or guide by which their exercise of such powers is to be governed or their discretion controlled, and leaves wholly to such majority the determination of whether there shall be a law at all and, if there is to be a law, what the terms thereof shall be.

"Under our constitution, article IV, section 1, the power to make and declare laws, subject only to the initiative and referendum powers reserved to the people, is vested exclusively in the legislative assembly and, by article III, section 1, the powers of government are divided into three departments, namely: the legislative, the executive, including the administrative, and the judicial, and each of said departments is prohibited from exercising any of the powers conferred upon either of the others. Under these provisions the legislature can not confer upon any person, officer, agency or tribunal the power to determine what the law shall be.

"* * * * *.

"* * * This leaves wholly to persons outside of the legislature the power to determine whether there shall be a law at all and, if there is to be a law, what the terms of that law shall be. It is impossible to conceive of a more complete delegation of legislative power and, since the act contravenes the plain provisions of our constitution in that it attempts to make an unlawful and unauthorized delegation of legislative power, the act is unconstitutional and void."

There is no difference in principle between an act which grants to an indefinite group the unrestricted power

to determine without rule or guide what the law shall be and when it shall be effective and the delegation of a like power to a private agency over which no department of our government has any control.

In commenting specifically on the application of Art I, § 21 of the constitution, the opinion in the Van Winkle case said:

"* * * It will be seen from a mere reading of the act that not only, as we have before stated, the question of whether there was to be a law, and, if so, what the terms of the law were to be was to be determined not by the legislature but by an indefinite and indeterminate group of persons representing some particular line of the industry covered by the act but also that the question of when such a law was to go into effect was dependent wholly upon the initiative of persons outside the legislature. This we think is a plain violation of the provision of the constitution last referred to and, in itself alone, would render the act void since it authorizes the making of laws the taking effect of which was made to depend upon the authority of persons not provided for in the constitution."

In *LaForge v. Ellis,* 175 Or 545, 154 P2d 844, the court considered the constitutionality of an act which authorized the board of barber examiners to establish minimum prices for barber services in any county whenever such prices had been agreed upon by at least 70 percent of the licensed barbers in such county. In declaring such act invalid as an unlawful delegation of legislative authority, the court relied on and quoted with approval from *Van Winkle v. Fred Meyer, Inc.,* supra.

In *Marr v. Fisher et al.,* 182 Or 383, 187 P2d 966, this court held that the legislature could enact a law to become operative upon the happening of a certain

contingency or future event, but in considering the constitutional prohibition against delegation of legislative power said:

"The purpose of the constitutional provision (Art. I, § 21), relied upon by plaintiffs, is to prevent unlawful delegation of legislative authority. The law-making power, under the Constitution of Oregon (Art. IV, § 1) is vested in the legislature, but the people have reserved unto themselves the power to initiate laws and to approve or reject at the polls any act of the legislative assembly. The people, having thus vested the legislative assembly with the law-making power, have in effect said that the legislature cannot confer such power upon any authority, except as provided in the Constitution. It is the constitutional function of the legislature to declare whether there is to be a law; and, if so, what are its terms."

The principles enunciated in the foregoing cases have been recognized and approved in *Bowden v. Davis et al.*, 205 Or 421, 289 P2d 1100 and *General Electric Co. v. Wahle*, 207 Or 302, 296 P2d 635.

The courts of several other states have had occasion to deal with statutes or ordinances attempting to adopt prospectively the national electrical code and subsequent amendments thereto. In *State v. Crawford*, 104 Kan 141, 177 P 360, 2 ALR 880, an act was held unconstitutional which provided that "All electrical wiring shall be in accordance with the national electrical code." The supreme court of Kansas said:

"* * * In our commonwealth the power to make, amend, alter, and repeal the laws is vested in the legislature. That body may not abdicate its functions nor delegate its powers to any other body, however learned, wise, and farsighted the latter may be. This principle of our Constitution and of our public policy is fundmental."

In *Agnew v. City of Culver City,* 147 Cal App2d 144, 304 P2d 788, the court considered the constitutionality of a city ordinance which provided that all electrical installations should be in conformity with the ordinance, the state electrical safety orders or, if not covered thereby, in conformity with the national electrical code as approved by the American Standards Association. The court held the ordinance invalid as an unlawful delegation of legislative powers. See also *City of Tucson v. Stewart,* 45 Ariz 36, 40 P2d 72.

■ Measured by the rules laid down in the foregoing cases, it is clear that the legislature in enacting ORS 479.420 and 479.430 has delegated completely its power to say what the law shall be and when that law shall become effective to the American Standards Association. It is difficult to conceive of a delegation of legislative power more certain or complete. The American Standards Association is a private organization with membership open to any industrial, commercial, technical or governmental group concerned with standardization work. No doubt its objectives are meritorious and its activities productive of much good. But the constitution does not sanction the delegation of a legislative power to any private agency no matter how well qualified such agency may be. It must be borne in mind that "beneficent aims, however great or well directed, can never serve in lieu of constitutional power." *Carter v. Carter Coal Co.,* 298 US 238, 291, 56 SC 855, 80 LE 1160. We therefore hold that because ORS 479.420 and 479.430 constitute an unlawful delegation of legislative power, they are unconstitutional and void.

We will next consider the national electrical safety code. By Oregon Laws 1921, ch 217, § 1 the Public Service Commission was authorized to regulate the

construction, maintenance and operation of power lines as follows:

"The public service commission of Oregon shall have power, after a hearing had upon its own motion or upon complaint, to require by general or special orders, embodying reasonable rules or regulations, every person, firm, corporation, association or municipality, their agents, lessees or acting trustees or receivers, appointed by court, engaged in the management, operation, ownership, or control of telegraph, telephone, signal, trolley or power lines within the State of Oregon, upon the public streets or highways, and also upon all other premises used, whether leased, owned or controlled by such persons, firms, corporations, associations or municipalities, engaged in public service operations, to construct, maintain and operate every line, plant, system, equipment or apparatus in such manner as to protect and safeguard the health and safety of all employes, passengers, patrons and the public, and to this end to adopt and prescribe the installation, use, maintenance and operation of appropriate safety or other devices, or appliances, to establish or adopt standards of construction or equipment, and to require the performance of any other act which may seem to said commission necessary or proper for the protection of the health or safety of all employes, passengers, patrons or the public."

Acting under the authority vested in it by the above act, the Public Service Commission on February 7, 1923 made its order No. 922, the pertinent portions of which read as follows:

"This matter came on for hearing before the Commission on January 26th, 1923, at the Court House, Portland, Oregon, in pursuance to the notice heretofore given on the 12th day of January, 1923.

"The Commission having fully considered the above entitled matter and having heard all the evidence adduced and representations made, and be-

ing fully advised in the premises, now finds that all rules previously adopted by the Commission governing overhead and underground construction should be annulled and cancelled, and that the "Definitions of Special Terms" (Sec. 1), "Rules Covering Methods of Protective Grounding" (Sec. 9), "Rules for the Installation and Maintenance of Electrical Supply Stations and Equipment" (Part 1), and "Rules for the Installation and Maintenance of Overhead and Underground Electrical Supply and Signal Lines" (Part 2) of the Electrical Safety Code as now issued in its third edition by the Bureau of Standards, Department of Commerce, which by this reference is made a part hereof, are in all respects adequate, just and reasonable and should be adopted in lieu thereof.

"IT IS THEREFORE ORDERED, that all general rules and regulations heretofore made and adopted by the Commission governing overhead and underground construction of electrical supply and signal lines, be and they hereby are annulled and cancelled, and that the portions of the National Electrical Safety Code as described in the above findings, and by such reference made a part hereof, together with any subsequent changes, modifications, or alterations in such code which may hereafter be issued or adopted by the Bureau of Standards of the Department of Commerce, or by such national agency as shall be a successor to the Bureau in its work of providing national electrical standards, be, and hereby are adopted."

The 1921 act quoted above is now codified as ORS 757.035 and the duties of the Public Service Commission have been transferred to the Public Utility Commissioner. It is alleged in plaintiff's second amended complaint that pursuant to PSC order No. 922, certain rules were adopted and in effect when the plaintiff was injured. Two rules taken from the March 1948 issue of the national electrical safety code are set out

haec verba and facts are alleged for the purpose of showing violation of said rules by the defendant.

■ The validity of Oregon Laws 1921, ch 217 as a proper grant of authority to an administrative agency is not challenged. The challenge is directed to PSC order No. 922. There can be no doubt that the Public Service Commission had the right after a hearing and the proper exercise of its administrative discretion to adopt a particular edition of the national electrical safety code as the standard applicable to construction and maintenance of electrical utility installations in Oregon. But neither the Public Service Commission nor its successor, the Public Utility Commissioner, had the right to adopt prospectively without hearing or further consideration subsequent changes, modifications or alterations in such code issued or adopted by the Bureau of Standards or such other national agency as might take over the work of providing electrical standards.

The wisdom of the constitutional prohibition against delegation of legislative power is illustrated by the following taken from the preface of the National Bureau of Standards Handbook issued in March 1948. We quote:

"In preparation of the first few editions of the code, the Bureau held meetings in many parts of the country and welcomed suggestions from everyone concerned. It, however, reserved to itself the final decision on all contested points. The procedure followed in later revisions subsequent to the establishment of the American Standards Association differs essentially from the former practice in that final decisions as to all details are made by the sectional committees formally approved by the American Standards Association and operating under their rules of procedure. The Bureau, as spon-

sor for the work under this procedure, has given up its prerogative of determining details in return for the implied understanding that the many parties concerned will accept such a code as they can agree upon among themselves. All such codes of practice necessarily include compromises between conflicting aims. The Bureau has felt that decisions made by practically unanimous agreement among the interests affected would, in general, be wiser than those at which it might arrive after weighing the arguments of advocates for different views. It has, therefore, welcomed this procedure in spite of the fact that this involves the acceptance of some details of which it might not itself approve."

▇▇▇▇ It will be seen from the above quotation that the Bureau of Standards has further delegated the responsibility for the adoption and amendment of the safety code to sectional committees composed of representatives of industrial, commercial, professional and governmental groups. It will be further seen that the code does not reflect, at least in all particulars, the best judgment of the Bureau of Standards but reflects in part compromises between the conflicting aims of the many parties concerned. We doubt that the positive duty imposed on the Public Utility Commissioner by ORS 757.035 is properly performed by blindly accepting in advance such safety regulations as may be adopted in the manner outlined above. The commissioner has a duty to determine after due consideration whether the changes, modifications, or alterations in the code approved by the Bureau of Standards are necessary and proper for the protection of the health and safety of the citizens of this state. The prohibition against delegation of power imposed on the legislature by the constitution applies with equal, if not greater, force to an administrative agency created by the legislature. Since PSC order No. 922 is a clear and com-

plete abdication of legislative power by an administrative order, we hold that said order is void.

 The plaintiff argues that defendant waived the right to question the validity on constitutional grounds of both electrical codes by failing to promptly and adequately raise the question upon the trial. The question was raised by the defendant in the trial court and if this case were here on appeal from a judgment for plaintiff, it would be necessary to decide whether the objections made and the exceptions taken by defendant were sufficient to authorize a review of the question by this court. However, since this case is here on appeal from an order granting a new trial, it is not necessary to consider the sufficiency of defendant's objections and exceptions taken on this point during the trial. It is well settled that a new trial may be granted on account of prejudicial error occurring upon the trial which was not called to the attention of the court during the trial and as to which no exception was taken. In this respect, the power of the trial court to set aside a judgment and grant a new trial and the power of this court to reverse a judgment on appeal are entirely different. The distinction is stated with concise clarity by Mr. Justice KESTER in the recent case of *Hays v. Herman,* 213 Or 140, 322 P2d 119, as follows:

> "* * * However, it has been held many times that where prejudicial error has been committed, the trial court may set aside a judgment and grant a new trial, even though there has been no ruling or exception in the lower court that would permit reversal on appeal if the new trial were denied. Timmins v. Hale, 122 Or 24, 32, 256 P 770; Lyons v. Browning, 170 Or 350, 354, 133 P2d 599. And this is true whether the new trial is granted on motion of a party, as in Correia v. Bennett & Johnson, 199 Or 374, 381, 261 P2d 851, or on the court's

own motion, as in Neal v. Haight, 187 Or 13, 31, 206 P2d 1197."

The third ground of the motion for new trial was based on the ruling of the trial court that the basic safety code adopted by the State Industrial Accident Commission, pursuant to ORS 654.035, was not applicable to the plaintiff. By its first affirmative defense, defendant alleges that plaintiff violated paragraphs 3.43, 3.44, 3.46 and 6.27 of the basic safety code, Part I, General, and paragraph 3.2 of the basic safety code, Part VI, Demolition. The trial court withdrew these allegations of contributory negligence from consideration by the jury and refused to instruct the jury that violations of the code by plaintiff in the particulars alleged would constitute negligence per se. Upon reconsideration, the court concluded that the basic safety code was applicable to plaintiff and that it had erred in withdrawing from the jury said allegations of contributory negligence.

■ The act regulating safety of places of employment was enacted by Oregon Laws 1920, ch 48, p 84 and is now codified, together with other related acts, in ORS ch 654. As in *M. & M. Co. v. State Ind. Acc. Com.,* 176 Or 35, 155 P2d 933, we will refer to the 1920 act as the "safety act" though it is not given that or any other name by statute. Although the State Industrial Accident Commission, hereinafter referred to as the "commission", is authorized to enforce the safety act, it is not an amendment of the workmen's compensation law but a separate and independent act.

■ Since the safety act is a penal statute, we are required by ORS 161.050[1] to construe the act ac-

[1] ORS 161.050. The rule of the common law that penal statutes are to be strictly construed has no application to the criminal and criminal procedure statutes of this state. Their provisions shall be construed according to the fair import of their terms with a view to effect their objects and to promote justice.

cording to the fair import of its terms with a view to effect its objects and to promote justice. In *Kirk v. Farmers' Union Grain Agency,* 103 Or 43, 47, 202 P 731, this court said:

> "In construing penal statutes, the legislative intent is in most cases to be found by giving to the words the meaning in which they are used in ordinary speech: Sarlls v. United States, 152 U.S. 574 (38 L. Ed. 557, 14 Sup. Ct. Rep. 720)."

From *State v. Bailey,* 115 Or 428, 432, 236 P 1053, we take the following:

> "A criminal offense cannot be created by inference or implication. Nor can the embrace of a criminal statute reach beyond the plain import of the language used: State v. LeBlanc, 115 Me. 142 (98 Atl. 119).
> "A valid criminal law must definitely show with reasonable certainty what acts or omissions the lawmaking body intended to prohibit and punish: 1 Cyclopedia of Criminal Law, Brill, § 62. * * *"

■ Viewed in the light of the foregoing standards of construction, we think the basic safety code is not applicable in this case. Whether plaintiff was an employer, an independent contractor or an employee need not be decided and in any event, the evidence bearing on this question is far from conclusive. Plaintiff alleged that he was employed by McManigle but his testimony indicated that he may have been an independent contractor. If the partnership composed of plaintiff and Gene Merrion was performing the work, neither would be an employee of the other partner. See *Dube v. Robinson,* 92 NH 314, 30 A2d 482 and *U.S.F. & G. Co. v. Neal,* 188 Ga 105, 3 SE2d 80. Defendant argues that the hiring of the tow truck with the driver made plaintiff an employer. We think the controlling question is whether there was any relationship existing

between plaintiff and the defendant which would make the safety act applicable. The answer to this question depends largely on the purpose for which the safety act was adopted.

■ It is worthy of note that the safety act was one of a series of acts adopted in the early part of this century for the protection of workmen. The factory inspection law was passed in 1907. The employer's liability act was proposed by initiative petition and enacted by a vote of the people in 1910. The workmen's compensation law was enacted by the legislature in 1913 and was followed by the safety act in 1920. It will be noted from a comparison of the statutes that the safety act is broader in scope than and in part a duplication of the factory inspection law.

The basic purpose of the safety act is clearly evident from the language of the first section thereof, now ORS 654.010,[2] which in substance requires every employer to (1) furnish employment safe for employees therein; (2) furnish a place of employment safe for employees therein; (3) furnish and use such safety devices and to adopt such means as are reasonably adequate to render such employment and place of employment safe; and (4) to do every other thing reasonably necessary to protect the life and safety of such employees.

The second section of the act, now ORS 654.015,[3] prohibits any employer, owner or lessee of any real property from constructing or maintaining any place

[2] ORS 654.010. Every employer shall furnish employment and a place of employment which are safe for employes therein, and shall furnish and use such safety devices and safeguards, and shall adopt and use such practices, means, methods, operations and process as are reasonably adequate to render such employment and place of employment safe, and shall do every other thing reasonably necessary to protect the life and safety of such employes.

[3] ORS 654.015. No employer, owner or lessee of any real property in this state shall construct or cause to be constructed or maintained, any place of employment that is not safe.

of employment that is not safe. The only conduct of an employee prohibited by the act is the interference in any way with the use of any safety device or method adopted for the protection of any employee in the employment or the place of employment. See ORS 654.020. [4]

Authority to make reasonable rules and regulations to carry into effect the provisions of the act is vested in the commission by ORS 654.025. [5] Under this authority the commission has adopted a basic safety code and other codes for particular industries. ORS 654.990 makes a violation of ORS 654.010 to 654.020 and any lawful order, rule or regulation promulgated by the commission punishable by fine or imprisonment.

■ If plaintiff was employed he was an employee of McManigle or the building owner and not an employee of defendant. If plaintiff had brought this action against McManigle and the building owner, the safety code, if applicable, would be used to measure the legal duty owing by the employer to the workman. It could not be used by the employer as a basis for charging his employees with contributory negligence.

Since the safety act was adopted for the protection of employees, the use of that act and the safety codes promulgated thereunder as a standard with which to

---

[4] ORS 654.020. No employe shall remove, displace, damage, destroy or carry off any safety device or safeguard furnished and provided for use in any employment or place of employment, or interfere in any way with the use thereof by any other person, or interfere with the use of any method of process adopted for the protection of any employe in such employment or place of employment, or fail to do every other thing reasonably necessary to protect the life and safety of such employes.

[5] ORS 654.025.

\* \* \* \* \*.

The commission may make, establish, promulgate and enforce all necessary and reasonable rules, regulations and provisions for the purpose of carrying ORS 654.005 to 654.100 into effect and in reference to the investigation of all violations of said statutes and fixing and setting the time and place for all hearings which may be necessary or expedient for the purpose of carrying said statutes into effect.

\* \* \* \* \*.

measure the conduct of an employee would defeat the obvious purpose of the act. As said by Mr. Justice ROBERT S. BEAN in *Hill v. Saugested,* 53 Or 178, 189, 98 P 524, "To hold otherwise would be, in effect, little short of a judicial repeal of the statute, and would place upon the servant the consequences of the unlawful act or omission of the master."

In the Saugested case, the court was considering whether the defense of assumption of risk was available in an action by an employee to recover damages for personal injuries sustained by coming in contact with a saw in the employer's mill. Plaintiff relied on the factory inspection law which required the operator of a factory, mill or workshop to provide and maintain reasonable safeguards for the benefit of his employees. In holding that the doctrine of assumption of risk did not apply in an action based on the failure of the master to comply with a statute enacted for the protection of the servant, the court said:

"In this condition of the adjudged cases, we feel at liberty to adopt that view which seems to us most likely to effectuate the purpose and object of the statute, and to hold that a master who fails and neglects to comply with its provisions by safeguarding his machinery cannot escape liability for an injury to a servant from such unguarded machinery on the ground that the servant assumed the risk of such injury. To hold otherwise would be, in effect, little short of a judicial repeal of the statute, and would place upon the servant the consequences of the unlawful act or omission of the master. As said by Mr. Justice Taft in the Narramore case, 96 Fed. 298 (37 C.C.A. 499: 48 L. R. A. 68): 'The only ground for passing such a statute is found in the inequality of terms upon which the company and its servants deal in regard to the dangers of their employment. The manifest legislative purpose was

to protect the servant by positive law, because he had not previously shown himself capable of protecting himself by contract; and it would entirely defeat this purpose thus to permit the servant 'to contract the master out' of the statute. It would certainly be novel for a court to recognize as valid an agreement between two persons that one should violate a criminal statute; and yet, if the assumption of risk is the term of a contract, then the application of it in the case at bar is to do just that.'"

There is a well defined difference between the breach of a legal duty imposed by the common law and the breach of a legal duty imposed by a statute designed for the protection of others. This distinction is clearly stated in *Osborne v. McMasters,* 40 Minn 103, 41 NW 543, as follows:

"* * * Negligence is the breach of legal duty. It is immaterial whether the duty is one imposed by the rule of common law requiring the exercise of ordinary care not to injure another, or is imposed by a statute designed for the protection of others. In either case the failure to perform the duty constitutes negligence, and renders the party liable for injuries resulting from it. The only difference is that in the one case the measure of legal duty is to be determined upon common-law principles, while in the other the statute fixes it, so that the violation of the statute constitutes conclusive evidence of negligence, or, in other words, negligence *per se.* * * * All that the statute does is to establish a fixed standard by which the fact of negligence may be determined."

The foregoing distinction was recognized and applied by this court in *Shelton v. Paris,* 199 Or 365, 261 P2d 856.

■ Although a few courts have adopted the rule that contributory negligence is not a defense in an ac-

tion brought under a statute passed for the protection of employees, the great majority of the courts have followed the rule that contributory negligence is a proper defense in such actions. See annotation, 171 ALR 894. But in determining whether the workman has been negligent, his conduct is to be measured by the common law rule of reasonable care and not by a statute enacted for his protection.

■ If the hiring of the tow truck with a driver made plaintiff an employer, then any duty imposed on the plaintiff by the safety act was owing by plaintiff to the driver, Wolgamot, and not to the defendant. In our opinion, there was no relationship of any kind existing between plaintiff and defendant to which the safety act could apply. Contributory negligence, like negligence, consists of a breach of a legal duty. The safety act imposed upon the plaintiff no duty whatever owing to the defendant. It follows that neither the safety act nor the safety code can be used to measure the negligence of plaintiff in this case. His conduct is to be measured by the applicable rules of the common law.

In *Varley v. Consolidated Timber Co.,* 172 Or 157, 139 P2d 584, a woman employed as a cook was injured while riding on a push-car operated on a logging railroad by a fellow employee. The cook was employed by an independent logging contractor who was cutting timber for the defendant, Consolidated Timber Co., which owned the logging railroad. The defendant admitted its negligence but alleged that plaintiff and the operator of the push-car were on its logging railroad in violation of the safety code. The court assumed that the safety code was applicable but held that it did not require clearance for moving push-cars on a logging road. We have examined the briefs and find

that the applicability of the safety code to the plaintiff in that case was not questioned. If the question had been raised, we doubt that the safety code would have been used as a standard to measure the duty of an invitee on a logging railroad to the owner thereof.

In *Snyder v. Prairie Logging Co., Inc.*, 207 Or 572, 580, 298 P2d 180, this court pointed out that a violation of a rule of the safety code, although constituting negligence per se, could not be taken advantage of by one who was not within the class of persons sought to be protected by the rule. The same principle is stated in Restatement, Torts 752, § 286, as follows:

> "The violation of a legislative enactment by doing a prohibited act, or by failing to do a required act, makes the actor liable for an invasion of an interest of another if:
>
> "(a) the intent of the enactment is exclusively or in part to protect an interest of the other as an individual:
>
> "* * * * *"

From the comment on clause (a) of the above section, we take the following:

> "A statute or ordinance may, because of its title, preamble, history or otherwise, be construed as intended to protect only the interests of a particular class of individuals. If so, a violation of the enactment can make the actor liable only to a person of that class."

In *Cook v. Seidenverg*, 36 Wash2d 256, 259, 217 P2d 799, the supreme court of Washington said:

> "We have several times applied the analogous principle, set forth in clause (a) of § 286, Restatement of Torts, cited above, to the effect that the violation of a statute or ordinance is not actionable negligence except with reference to persons in-

tended to be protected by such statute or ordinance. [citing cases]."

To the same effect see *Shipley v. City of Arroyo Grande,* 92 Cal App2d 748, 208 P2d 51 and *Dunbar v. Olivieri,* 97 Colo 381, 50 P2d 64.

■ We doubt that the legislature intended, in passing the safety act, to abrogate the common law rule of reasonable care and substitute in its place a statutory duty to govern the conduct of a large and indefinite segment of the population under an unlimited variety of circumstances. If the legislature intended the safety act to apply to any persons other than employers and owners, operators and lessees of places of employment, we think it would have clearly expressed such intention. We have no authority nor inclination to expand the act by implication beyond the fair import of its terms. We do not mean to imply, however, that the duty imposed on an employer by the safety act is imposed only for the benefit of his own employees. The exact scope of an employer's duty under the act will be considered when, if ever, that question is properly before us.

■ Plaintiff has relied in part on *Larson v. Papst,* 205 Or 126, 286 P2d 123, and it is necessary to point out that the protection of the safety act is not limited to workmen engaged in hazardous employment. The safety act applies to every employer and there is nothing in the act implying an intent to limit the act to employers engaged in hazardous employment. The contrary holding in *Larson v. Papst,* supra, seems to be based on a misconception of the opinion in *M. & M. Co. v. State Ind. Acc. Com.,* supra. That case involved the constitutionality of Oregon Laws 1943, ch 416, which required employers engaged in hazardous occupations who elected not to be subject to the workmen's compensation law, to contribute to the industrial

accident fund for the purpose of financing a "safety program" among employers who had rejected the law. The 1943 act was held unconstitutional and in the course of the opinion, Mr. Justice BELT made the following statement:

> "* * * Having in mind that the purpose of such 'safety program' is for the protection of workmen engaged in hazardous employment, we are unable to conceive of any reasonable ground for making the classification."

The foregoing sentence taken from the M. & M. Co. case is made the basis for the holding in *Larson v. Papst,* supra. It is obvious from a reading of the opinion in the M. & M. Co. case that the safety program which the author had in mind in making the statement quoted above, was the safety program referred to in § 1 of the 1943 act and not Oregon Laws 1920, ch 48, which was referred to in the same opinion as the "safety act." In fact, on the preceding page of the opinion, Mr. Justice BELT had expressly pointed out that the safety act is applicable to every employer in the following language:

> "* * * For the purpose of clarity and brevity, this act [Oregon Laws 1920, ch 48] will be hereafter referred to as the 'Safety Act', although in the act itself it is not so designated nor is it given any other name. It is clear that the act, so far as it pertains to the safety of employees, *is applicable to every employer whether subject to the Workmen's Compensation Act or not."* (Italics ours)

It is not necessary to consider whether *Larson v. Papst,* supra, properly decided that the safety act did not apply to the employment of domestic help in private homes, but insofar as the case holds that the safety act applies only to employers engaged in hazardous occupations, it is overruled.

The fourth and fifth errors assigned in the motion for a new trial involve the failure of the court to grant a mistrial because of the alleged misconduct of a juror and a prejudicial statement voluntarily made by a medical witness. Since these problems will not recur upon a new trial, they do not require comment in this opinion.

The sixth ground of the motion was based on the refusal of the court to allow expert testimony as to the applicability of the electrical code and the electrical safety code to defendant's installation. We think the court did not err in refusing to admit such testimony. When conduct is regulated by statute or rule, the meaning, effect and applicability of the statute or rule are questions for determination by the court. See *Baldassarre v. West Oregon Lbr. Co.*, 193 Or 556, 239 P2d 839. Expert testimony may be received as an aid to proper interpretation if the statute or rule (a) uses technical terms not generally understood, *Order of Conductors v. Swan*, 329 US 520, 67 SC 405, 91 LE 471; or (b) is ambiguous or indefinite, *Union Pacific R. R. Co. v. Anderson*, 167 Or 687, 120 P2d 578.

The seventh ground of the motion for new trial was based on the refusal of the court to allow defendant to offer expert testimony as to whether defendant's installation was properly installed. The trial court concluded that it had erred in excluding this testimony. Since we have held that both the electrical code and the national electrical code are not applicable to this case, they should not be admitted in evidence. See *Devine v. S. P.*, 207 Or 261, 295 P2d 201; *Mississippi Power & Light Co. v. Whitescarver*, 68 F2d 928; *Grant v. Libby, McNeill & Libby*, 160 Wash 138, 295 P 139. Expert testimony may be admitted to show whether defendant's electrical equipment was properly installed

and maintained. See *Robertson v. Coca Cola Bottling Co.*, 195 Or 668, 680, 247 P2d 217, where this court said:

"* * * But, although the customary practice in a business or trade is not the legal measure of due care, this court has firmly established the rule that evidence of such custom or practice, while not controlling, may be considered by the jury, together with other evidence, in determining whether the acts done were negligent. *Myrtle Point Transp. Co. v. Port of Coquille River*, 86 Or 311, 168 P 625; *Hise v. City of North Bend*, 138 Or 150, 6 P2d 30; *Silver Falls Timber Co. v. E. & W. Lbr. Co.*, 149 Or 126, 40 P2d 703; *Shaver Co. v. Eagle Star Ins. Co.*, 172 Or 91, 109, 139 P2d 769."

See also *Young v. Bates,* 52 Cal App2d 86, 125 P2d 840. *Oklahoma Gas & Electric Co. v. Oliphant,* 172 Okl 635, 45 P2d 1077; 20 Am Jur 689. Evidence § 819 and 146 ALR 5, 34.

We agree with the trial court that prejudicial error was committed and that the order setting aside the judgment for plaintiff and granting a new trial was properly entered. It is therefore necessary that we turn our attention to the cross-appeal of the defendant.

■ Plaintiff contends that an order denying a motion for a judgment n.o.v. is not an appealable order and that defendant's cross-appeal should be dismissed. We must therefore determine whether under the circumstances existing in this case, defendant has a right to cross-appeal. It is true that ORS 19.010 which enumerates the judgments, decrees and orders from which an appeal may be taken does not include an order denying a motion for judgment n.o.v. In the ordinary case where a motion for a judgment n.o.v. is denied an appeal can only be taken from the judgment as entered. In this respect an order denying a motion for a judg-

ment n.o.v. does not differ from an order denying a motion for a new trial.

But in *Fowler v. Courtemanche et al.,* 202 Or 413, 274 P2d 258, it was held that a procedural change had been effected by implication by the enactment of Oregon Laws 1945, ch 149, p 209. The 1945 amendment is now contained in ORS 18.140, and reads as follows:

"A motion in the alternative for a new trial may be joined with a motion for judgment notwithstanding the verdict, and unless so joined shall, in the event that a motion for judgment notwithstanding the verdict is filed, *be deemed waived.* When both motions are filed, the motion for judgment notwithstanding the verdict shall have precedence over the motion for a new trial, and if granted the court shall, nevertheless, rule on the motion for a new trial and assign such reasons therefor as would apply had the motion for judgment notwithstanding the verdict been denied, and shall make and file an order in accordance with said ruling."

The procedural problem presented in the Fowler case was the converse of the problem presented here. In that case the jury returned a verdict for plaintiff upon which judgment was entered. The defendant filed a motion for judgment n.o.v. and in the alternative a motion for a new trial. The court granted the motion for a judgment n.o.v. but denied the motion for new trial. The plaintiff appealed from the judgment n.o.v. and the defendant cross-appealed from the order denying a new trial. This court first held that the trial court erred in granting the judgment n.o.v. and then considered the cross-appeal and held that the motion for a new trial should have been granted. In considering the effect of the 1945 amendment, the court said:

"* * * Under the statute [ORS 18.140], if a motion for a new trial is not joined with the mo-

tion for judgment n.o.v., it is waived. The clear intent of the statute is, that if both motions are joined, there is no waiver. The provision of the statute which requires the trial court to consider first the motion for judgment n.o.v. and which provides that if granted, the court shall, nevertheless, rule on the motion for new trial 'and assign such reasons therefor as would apply had the motion for judgment notwithstanding the verdict been denied' clearly manifests the legislative intent that if this court reverses the judgment n.o.v., there shall be available to us a record from which we may determine whether there is merit in the errors assigned in the motion for a new trial. * * * We are of the opinion that the merits of the motion for a new trial are before us for consideration and we hold that under these circumstances the right to appeal from the adverse decision of the trial court on the motion for a new trial is granted by implication. If an appeal could not be taken from the order denying a new trial, there would be no way by which this court could reach prejudicial errors apparent on the face of the record."

The court did not mention Oregon Laws 1945, ch 123, which amended § 10-811, OCLA (now ORS 19.130) by adding thereto the following proviso:

"* * * provided, however, that upon an appeal from a judgment notwithstanding the verdict, the appellate court may consider the correctness of the ruling of the circuit court on a motion for a new trial when joined with a motion for judgment notwithstanding the verdict if such ruling is assigned as erroneous in the brief of any party affected by the appeal."

This amendment eliminated the necessity of a cross-appeal from an order denying a new trial when an appeal is taken by the adverse party from a judgment n.o.v. By assigning as error in his brief the denial

of his motion for a new trial, the respondent may have that ruling reviewed if the judgment n.o.v. in his favor is set aside. Both chapter 123 and chapter 149, Oregon Laws 1945 were enacted as a result of observations made by this court in *Varley v. Consolidated Timber Co.*, 172 Or 157, 139 P2d 584.

■ Probably because the problem had not arisen the legislature did not also eliminate the necessity for a cross-appeal under the circumstances existing in the case at bar. In any event, we believe the rule adopted in the Fowler case in the converse of our present problem is applicable and decisive here. The defendant moved for a judgment n.o.v. and in the alternative for a new trial. The defendant could not appeal from the judgment for the plaintiff because it was set aside. If the motion for a judgment n.o.v. had been granted, a final judgment would have been entered. If a cross-appeal can not be taken from the order denying the motion for judgment n.o.v., there would be no way for this court to review the questions raised by that motion. One of the important questions raised by the motion in this case is the immunity of the defendant as a public corporation from all tort liability. It would be unfortunate if after a new trial resulting in another verdict for plaintiff, we held on a second appeal that defendant as a public corporation had been immune from liability from the outset. We therefore hold that when an appeal is taken from an order granting a new trial the right to cross-appeal from an adverse decision on a motion for judgment n.o.v. is also granted by implication and that we are authorized to consider the merits of that motion.

We believe the rule adopted in the Fowler case and followed here is particularly applicable in cases such as the one at bar in view of the different objectives of a

motion for a new trial and a motion for a judgment n.o.v. The objective of a motion for new trial as expressed in ORS 17.605 is to bring about "a re-examination of an issue of fact in the same court after judgment." The principal use of a motion for judgment n.o.v., under the statute as amended in 1941, is to renew after an adverse verdict a motion for a directed verdict made and denied during the trial. The allowance of the motion for judgment n.o.v. results in a final judgment without a new trial. This court, in *Herndobler v. Rippen*, 75 Or 22, 146 P 140, held that "a trial court exceeds its powers when upon motion for a new trial, it sets aside a verdict and enters a final judgment without such trial." See also *Hughes v. Holman et al.*, 110 Or 415, 430, 223 P 730. In both of the cases last cited, the final judgments entered without a new trial were not disturbed because in each case it was evident that a new trial would be futile.

The defendant in support of its cross-appeal assigns as error the denial of its motion for a judgment notwithstanding the verdict. That motion was based on the following three grounds:

(1) That the defendant is a quasi-municipal corporation of the State of Oregon and as such immune from liability for the torts alleged in the complaint;

(2) That the plaintiff, by his own testimony, was guilty of contributory negligence as a matter of law;

(3) That there was no satisfactory evidence of any negligence on the part of the defendant which was the proximate cause of the accident in question.

We will first consider the question of governmental immunity. Whether the defendant is immune from tort liability depends on the status of defendant, the

nature of the activity in which it is engaged and the application of ORS 30.320 thereto.

This court has held that people's utility districts, together with school districts, irrigation districts and port districts, are included in the general classification of municipal corporations but has further classified such districts as quasi-municipal corporations to distinguish them from cities which are referred to as pure municipal corporations. See *Wasco County P.U.D. v. Kelly*, 171 Or 691, 137 P2d 295 and *In re People's Utility District*, 160 Or 530, 86 P2d 460.

■ It is now well settled in Oregon that a quasi-municipal corporation is not liable in tort unless such liability is expressly imposed by statute. See *Blue v. City of Union*, 159 Or 5, 75 P2d 977 and cases cited therein.

■ The statute imposing tort liability on public corporations, both municipal and quasi-municipal, is now codified as ORS 30.320, as follows:

"A suit or action may be maintained against any county and against the State of Oregon by and through and in the name of the State Highway Commission upon a contract made by the county in its corporate character, or made by such commission, after February 28, 1929, and within the scope of its authority, and not otherwise, and an action or suit may be maintained against any other public corporation mentioned in ORS 30.310 in its corporate character, and within the scope of its authority, or for an injury to the rights of the plaintiff arising from some act or omission of such other public corporation."

The other public corporations mentioned in ORS 30.310 are incorporated cities, school districts and other public corporations of like character.

The application of this statute to a tort action against a quasi-municipal corporation was apparently first considered by this court in *Mackay v. Commission of Port of Toledo,* 77 Or 611, 617, 152 P 250. The plaintiff in that case, an employee of the Port of Toledo, was injured by the breaking of a defective ladder while working on a dredge operated by the port. The port claimed that it was immune from liability as a municipal corporation engaged in a governmental function. This court in holding that the statute in question was applicable to a port district, said:

> "It must be conceded that defendant is a municipal corporation and in the class of 'the other public corporations' mentioned in the statute just quoted which the law permits to be sued in their corporate character for an injury to the rights of a plaintiff arising from its acts or omissions. As to such corporations the courts have undertaken to make a distinction between such acts as are governmental or, in a sense, judicial, upon the one hand, and such as are ministerial or for the sole benefit of the corporation, upon the other. This distinction, while clear, is difficult of definition in general terms, and must be determined largely upon the facts of the individual case. * * *"

The court further held that the port was engaged in a proprietary function and therefore was liable to the plaintiff for the injury resulting from its negligence.

That the statute imposes tort liability on a quasi-municipal corporation only when it is acting in a private, corporate or proprietary capacity is fully settled by the decision in *Antin v. Union High School Dist. No. 2,* 130 Or 461, 280 P 664. That case involved the liability of a school district for the wrongful death of a pupil caused by the explosion of a pneumatic water

tank in the school. In ruling upon the liability of the district under the statute the court said:

"Under our statute, Sections 357, 358, Or. L. [ORS 30.310 and 30.320], a school district may sue or be sued, and an action may be maintained against a school district 'for an injury to the rights of the plaintiff arising from some act or omission' of the district: Or. L., § 358 [ORS 30.320]. If this were a case of first impression and there were no controlling decisions upon this question, we would be inclined to hold, at least such is the opinion of the writer, that the legislature intended by the enactment of these two sections to make a school district liable for the consequences of its own wrongful or negligent acts, although not liable for the misfeasance or nonfeasance of its officers or agents; and such was the effect of the holding in McCalla v. Multnomah County, 3 Or. 424, when the statute as then in force, now Section 358, Or. L. [ORS 30.320], embraced not only incorporated towns, school districts and other public corporations of like character, but also counties. But this statute has been too often construed by this court, and held not to include within its purview an injury arising from some public or governmental act of a public corporation, to be now open to question in respect to the nonliability of a public corporation for an injury arising from the performance by it of a public or governmental act: Caspary v. City of Portland, 19 Or. 496 (24 Pac. 1036, 20 Am. St. Rep. 842); Esberg Cigar Co. v. City of Portland, 34 Or. 282 (56 Pac. 691, 75 Am. St. Rep. 651, 43 L.R.A. 435); Wagner v. Portland, 40 Or. 389 (67 Pac. 300); Pacific Paper Co. v. Portland, 68 Or. 120 (135 Pac. 871); Blake-McFall Co. v. Portland, 68 Or. 126 (135 Pac. 873); Wiest v. School Dist. No. 24, 68 Or. 474 (137 Pac. 749, 49 L.R.A. (N.S.) 1026); Ryder v. La Grande, 73 Or. 227 (144 Pac. 471); Coleman v. La Grande, 73 Or. 521 (144 Pac. 468); Humphry v. Portland, 79 Or. 430 (154 Pac. 897);

Spencer v. School Dist. No. 1, 121 Or. 511 (254 Pac. 357)."

The court further held that because the school district was acting in a governmental capacity, no liability was imposed on it by the statute.

The decision in the Antin case was followed in *Lovell v. School Dist. No. 13,* 172 Or 500, 143 P2d 236, which again held that ORS 30.320 does not impose any liability on a school district while acting in the governmental capacity, and further held that a school district acts only in a governmental capacity.

The most recent case involving the tort liability of a quasi-municipal corporation is *Wickman et al. v. Housing Authority,* 196 Or 100, 247 P2d 630. That was a damage action for the destruction of personal property by fire caused by the alleged negligence of the Housing Authority of Portland, a quasi-municipal corporation. This court held that the housing authority was acting in a governmental capacity and was therefore immune from tort liability.

Since it is now so firmly established in this state that public corporations, including quasi-municipal corporations, are subject to tort liability only when they are acting in a private, corporate or proprietary capacity, the liability of the defendant in this case turns on whether it functions in a proprietary or a governmental capacity.

█ Viewed in the light of the prior decisions of this court, we think that the functions of a people's utility district are essentially proprietary in nature. We have already referred to *Mackay v. Commission of Port of Toledo,* supra, which held that the port district was engaged in a proprietary function. It is interesting to note that in the later case of *Myrtle Pt. T. Co. v. Port*

*of Coquille River,* 86 Or 311, 168 P 625, a tort action against a port district, the question of governmental immunity from tort liability was not raised by the defendant. In the still later case of *Dix et al. v. Port Orford et al.,* 131 Or 157, 282 P 109, which involved the right of the port district to sell dock and wharfage property, it was held that the defendant port district in the operation of the wharf was acting in a proprietary capacity.

A similar situation exists with regard to irrigation districts. *Twohy Bros. Co. v. Ochoco Irr. Dist. et al.,* 108 Or 1, 210 P 873, 216 P 189, was an action on a contract for the construction of an irrigation dam in which the court held that the district was not liable because the contract had been entered into without competitive bidding as required by law. The question of the capacity in which the irrigation district was acting became important, however, when it was urged on rehearing that the irrigation district if acting in a proprietary capacity could be liable upon an implied contract. The court held that the district was not liable even on an implied contract but held that the district acted in a proprietary capacity, and said:

> "The acts performed, and the duties discharged, by an irrigation district, in constructing an irrigation works for supplying water for irrigation to the land owners of the district, so closely resemble the powers exerted by a city in providing a water system, that it necessarily follows that an irrigation district, in constructing its irrigation system, is exercising a private or proprietary power. In doing so, however, it does not lose 'its distinctive municipal character.' Lehigh Water Company's Appeal, 102 Pa. St. 515, 528. Its acts and duties are public, at least in the sense that they are performed by public officers for the benefit of that portion of the public within its limits."

The later case of *Patterson v. Horsefly Irrigation Dist.*, 157 Or 1, 69 P2d 282, 70 P2d 36, was an action for damages to plaintiff's land caused by the alleged negligence of the district in the construction, operation and maintenance of its irrigation ditches and the raising of a dam. The district did not raise and the court did not mention the defense of governmental immunity and the district was held liable for the damage caused by its negligence although the case was reversed for a new trial on other grounds.

Oregon Constitution, Art II, § 12 and ORS ch 261 authorize the creation of people's utility districts with broad powers designed to confer general benefits on the property and persons within the districts. The powers vested in such districts as enumerated in ORS 261.305, are:

"People's utility districts shall have power:

"(1) To have perpetual succession.

"(2) To adopt a seal and alter it at pleasure.

"(3) To sue and be sued, to plead and be impleaded.

"(4) To acquire and hold real and other property necessary or incident to the business of such districts, within or without, or partly within or partly without, the district, and to sell or dispose of such property; to acquire, develop and otherwise provide for a supply of water for domestic and municipal purposes, waterpower and electric energy, and to distribute, sell and otherwise dispose of water, waterpower and electric energy, within or without the territory of such districts.

"* * * * *"

■ Although it is sometimes very difficult to determine whether a particular function of a public corporation is governmental or proprietary, the problem in this case is simplified by reference to the decisions

involving the activities engaged in by cities. It is now settled beyond doubt that when a city engages in the operation of a municipal dock, airport, auditorium, water system or electric utility system, it is engaged in a proprietary function. See *Esberg Cigar Co. v. Portland,* 34 Or 282, 55 P 961, 43 LRA 435; *Stephens v. City of Eugene,* 90 Or 167, 175 P 855; *Bennett v. City of Portland,* 124 Or 691, 265 P 433; *Butler v. City of McMinnville,* 126 Or 56, 268 P 760, 59 ALR 381; *Hise v. City of North Bend,* 138 Or 150, 6 P2d 30; and *Mollencop v. City of Salem,* 139 Or 137, 8 P2d 783.

It will be noted that ORS 30.320, which authorizes a tort action against public corporations, excepts only counties from such liability and makes no distinction between other public corporations. It was held in *Blue v. City of Union,* supra, that as applied to the proprietary activities of a city, this statute did not create a new liability but was merely declaratory of the common law. It was also held that as applied to public corporations other than cities, the statute created a new liability which did not otherwise exist.

This court has held that a statute which creates a new liability should be strictly construed. *McFerren v. Umatilla County,* 27 Or 311, 40 P 1013; *Jones v. Union County,* 63 Or 566, 127 P 781; *Rapp v. Multnomah County,* 77 Or 607, 152 P 243; *Blue v. City of Union,* supra; *Lovell v. School District No. 13,* supra; and *Marsh v. McLaughlin et ux.,* 210 Or 84, 309 P2d 188. Since *Blue v. City of Union,* that portion of the statute with which we are concerned here has been restored to its original form. As so restored, we see no necessity for construction of the statute when applied to the corporate or proprietary activities of a public corporation. As applied to such activities, the

statute is clear and free from any ambiguity. When the language of a statute is plain and unambiguous and its meaning clear, there is no room for construction, strict or otherwise. *State v. Newman,* 109 Or 61, 218 P 936.

Since the statute makes no distinction between the tort liability of cities and other public corporations when acting in a proprietary capacity, we see no reason to create such a distinction by judicial construction. The application of the statute to port districts and irrigation districts has apparently been accepted as a matter of course and we think it should be applied with like effect to people's utility districts.

■ Liability has been denied as to a school district and a housing authority not because the statute did not apply but because the activities engaged in by said corporations were held to be governmental rather than proprietary. In distinguishing between the governmental and proprietary functions of a public corporation, we think the result should depend on the nature and purpose of the activity engaged in and not on whether the corporation is a municipal or quasi-municipal body. Such has been the tenor of our prior decisions.

■ A people's utility district may be composed of a city or of a city together with a parcel of unincorporated territory. It would be a strange rule indeed which held a city liable when operating a water or utility system and exempted a quasi-municipal corporation when engaged in the same activity, particularly when the quasi-municipal corporation may include a city. As said by the supreme court of California in considering a like problem involving the tort liability of a municipal utility district, "Such a rule does not appeal to our sense of justice nor our reason." *Morrison v. Smith Bros., Inc.,* 211 Cal 36, 293 P 53. We therefore hold

that the defendant in operating and maintaining its utility system is engaged in a proprietary function and is subject to the liability imposed by ORS 30.320.

■ By the second ground of its motion for judgment n.o.v., defendant contends that plaintiff was guilty of contributory negligence as a matter of law. The rule decisive of this question is well settled but the application of the controlling principle of law to the facts of this case presents some difficulty. The rule by which plaintiff's conduct must be measured is stated in *Carroll v. Grande Ronde Elec. Co.*, 47 Or 424, 443, 84 P 389, as follows:

> "* * * the rule of law is that one who voluntarily assumes a position of danger, the hazards of which he understands and appreciates, cannot recover for an injury from a risk incident to the position: Fitzgerald v. Connecticut River Paper Co., 155 Mass. 155 (29 N.E. 464, 31 Am. St. Rep. 537); Robinson v. Manhattan Ry. Co., (Com. Pl.) 25 N.Y. Supp. 91."

In *Brockman v. Mitchell Bros.*, 213 Or 88, 320 P2d 266, we applied the above rule and called attention to the statement thereof in different language in 1 Prosser, Torts (2nd ed) 303, § 55.

■ The essential element of the rule is knowledge and appreciation of the risk on the part of the plaintiff and our decision here must turn on that point. If the evidence established that plaintiff knew that the pothead was dangerous, then it would be necessary to decide whether plaintiff, in working so near the pothead, voluntarily assumed a position of danger and was negligent as a matter of law.

■ However, we have examined the record with care and can find no evidence that plaintiff knew that the pothead was charged with electricity or that con-

tact with the top of the pothead or the pigtail would cause death or injury. Plaintiff of course knew that defendant's transformer platform was an electrical installation and that the transmission cable suspended therefrom carried a high voltage of electricity. But plaintiff at all times was several feet from the transmission cable and was not endangered thereby even if it had not been insulated. Plaintiff was not asked whether he knew or had reason to believe that the pothead was dangerous. Neither was plaintiff asked whether he assumed that the pothead was harmless. Plaintiff testified that he did not know what a pothead was until one was introduced in evidence during the trial, although he admitted that he saw the device on the crossarm near the wall. Plaintiff also testified that he did not recall seeing any cable running from the main transmission line to the base of the pothead. According to his testimony, plaintiff had climbed from the crossarm back onto the wall and was engaged in pushing on the steel plate when his right foot accidentally touched the uninsulated portion of the pothead. In the absence of evidence to the contrary, the law presumes that plaintiff was free from negligence. *Schweiger v. Solbeck et ux.,* 191 Or 454, 470, 230 P2d 195 and *Simpson v. Hillman,* 163 Or 357, 363, 97 P2d 527. Viewed in the light of this presumption, plaintiff's conduct would seem to indicate an assumption on his part that the pothead was harmless. With the record in this state, any holding that plaintiff knew that the pothead was charged with electricity would be based on speculation.

We also think that it was a question of fact for the jury as to whether the pothead presented such an open and visible risk as to require plaintiff to ascertain at his peril whether it was in fact dangerous.

"An open, visible risk is such a one as would in an instant appeal to the senses of an intelligent person." *Johnston v. O.S.L. Ry. Co.*, 23 Or 94, 105, 31 P 283. We have not found evidence in this case which would justify us in holding as a matter of law that these pot-heads constituted such a risk. We therefore conclude that the question of plaintiff's negligence was properly submitted to the jury.

██ The third ground of defendant's motion for judgment n.o.v., is based on the contention that there was no substantial evidence of negligence on the part of the defendant which was the proximate cause of plaintiff's injury. It is well settled that in considering a motion for a directed verdict, plaintiff is entitled to the benefit not only of his own testimony, but also all evidence favorable to him, including that introduced by defendant, considered in the light most favorable to plaintiff. See *Finn et al. v. S. P. & S. Ry. Co.*, 194 Or 288, 241 P2d 876; *Doty v. Southern Pacific Co.*, 186 Or 308, 207 P2d 131; and *Bockman v. Mitchell*, supra.

██ It is well settled that one engaged in the transmission of electricity must exercise a degree of care commensurate with the danger involved. The law imposes on the owner of wires carrying a high and dangerous current of electricity the duty to exercise the utmost care in the construction, inspection, maintenance and repair of such wires so as to keep them harmless at places where persons are liable to come into contact with them. *Perham v. Portland Electric Co.*, 33 Or 451, 53 P 14, 40 LRA 799; *Gentzkow v. Portland Railway Co.*, 54 Or 114, 102 P 619; *Clayton v. Enterprise Electric Co.*, 82 Or 149, 161 P 411; *Saylor v. Enterprise Electric Co.*, 110 Or 231, 222 P 304; *Sander v. Calif.-Ore. Power Co.*, 133 Or 571, 291 P 365; and *Sullivan v. Mount. States Power Co.*, 139 Or 282, 9 P2d 1038.

■ It is admitted that plaintiff's injury resulted from contact with an exposed pothead charged with a high voltage of electricity, installed and maintained by defendant at a distance of about 14 inches from the wall of a fire-gutted private building. There was evidence that these potheads had been maintained in that condition for many years. There was also evidence that the potheads could have been easily removed, disconnected or guarded. The owner of the adjacent property had a right to demolish this wall or to make such use of his property as he saw fit. The property owner was not required to maintain this wall as a permanent shield for defendant's transformer installation and defendant had no right to rely on him to do so. Accepting his testimony as true, which we must in considering this motion, plaintiff at the time of his injury was on top of the wall where he had a right to be. The fact that plaintiff arrived at his position on the wall by stepping on defendant's crossarm instead of climbing onto the wall directly from the ladder has no bearing on the degree of care to be exercised by defendant. As said in *Cooper v. North Coast Power Co. et al.*, 117 Or 652, 662, 244 P 665, 245 P 317:

"It was the duty of the defendants in the construction and maintenance of the power line to provide such protection as would guard against any contingency that was reasonably to be anticipated."

Whether the defendant should have anticipated that the owner of the wall would tear it down or use it in such a way that workmen or others would be endangered by defendant's installation, was a question for the jury. Under the circumstances we can not hold as a matter of law that defendant was free from negligence. Whether defendant was negligent, and if so, whether such negligence was a proximate cause of

plaintiff's injury, are questions for the jury. We conclude that the trial court properly denied the motion for judgment n.o.v. and properly allowed the motion for a new trial.

Affirmed.